John H. Bantum, Defendant Below, Plaintiff in Error, v. The State of Delaware, Plaintiff Below, Defendant in Error.

---

488

(*January* 9, 1952.)

SOUTHERLAND, Chief Justice, TUNNELL, Justice, and CAREY, J., sitting.

*Newton White* for plaintiff in error.

*H. Albert Young,* Attorney-General, *Vincent A. Theisen* and *Stephen E. Hamilton, Jr.,* Deputy Attorneys-General, for the State.

Supreme Court, No. 4, February Session, 1951.

SOUTHERLAND, C. J.:

The record presents several questions, which may be summarized as follows:

I. Was there sufficient evidence to support the conviction?

II. Was evidence properly admitted that defendant, after shooting and killing deceased, attempted almost immediately thereafter to kill another person?

III. Was the admission of photographs of the scene of the crime, showing the body of the deceased, improper and prejudicial?

IV. Did the trial court err in submitting the case to the jury in the evening, after the usual adjournment time?

V. Was the verdict "guilty as indicted" a nullity?

VI. Was there error in the charge of the court to the jury?

The facts of the case—almost wholly undisputed—are as follows:

The defendant, John H. Bantum, was at the time of the crime twenty years of age, married and a resident of Philadelphia, having removed from his former home near Hockessin, Delaware, at the age of sixteen. He had served three years in the army (1946-1949), and, though unemployed, was awaiting entrance to an automotive school under the G. I. bill.

On Friday, September 16, 1949, he left Philadelphia to visit relatives in Kennett Square, Pennsylvania. He stopped in a taproom in Philadelphia and (according to his testimony at the trial) bought two marijuana cigarettes. He took the bus to Kennett Square, and after stopping at a barroom went to see a sister, and then returned to the barroom, having smoked (he testified) one of the marijuana cigarettes. He stayed at the bar until 11:30 p. m., apparently drinking a good deal, and, after a visit with some friends, went to the bus station and found it closed. He decided to walk to Hockessin, hoping to get transportation to Wilmington and thence to Philadelphia. He had taken with him when he left Philadelphia a 32-caliber Iver Johnson revolver, and on his way to Hockessin he loaded the weapon, having be-

fore he left put in his pocket a number of bullets taken from a box at his home. The revolver was in his belt on the side with the last three buttons of his jacket buttoned over it. As he was approaching Hockessin (he testified) he smoked the second marijuana cigarette.

About two-thirty o'clock he came to the house of the deceased, Jack Copper, his cousin and an acquaintance of many years. The house was lit, and Copper's wife, Belle Copper, was on the porch. He identified himself and she recognized him and admitted him to the house. The Coppers' house contained a living room extending across the entire width, and a bedroom and another small room in the rear. Copper, who was in the bedroom when Bantum arrived, though not asleep, came into the living room, and the two men engaged in conversation. Belle Copper withdrew to the bedroom. Bantum asked Copper to take him to Wilmington. Copper refused. Bantum tried to persuade him, and both men became angry and began to quarrel and to curse each other. Copper was sitting near a china closet to the left as one enters the front door, and Bantum was sitting near a small table in the right hand corner. Defendant testified: "He [Copper] jumped up and started toward the bedroom. I jumped up immediately, and that is when I pulled my gun and shot, before I realized it I was standing there with the gun in my hand." Bantum shot Copper twice in the back as the latter was walking away from him toward the bedroom. Copper had drawn no weapon nor had he threatened Bantum. Belle Copper came out of the bedroom and Bantum threatened her with the revolver and made her return to the bedroom. The evidence is not clear as to the exact sequence of events, but it appears from his statements to the police (the voluntary nature of which is not challenged) that defendant shot at her three times and wounded her at least once, the third time after she had fallen or rolled under the bed. He then went outside, listened to see if anybody had heard the shots, emptied the revolver of five shells, and reloaded it. The empty shells were later found by the police. He then returned to the house. Belle Copper was

wounded but not dead, and he knelt down and asked her about the keys to the car. He could not find them and he then fired a fourth shot at her. Returning to the living room he broke open the china closet, took five dollars and the car keys, went back to the bedroom and asked Belle "was she dead". She said "no" and begged him not to shoot again and gave him a dollar and fifty cents in change from her pocketbook. He "didn't shoot again because [he] thought she would die." Taking Copper's car he drove to Kennett Square, and thence to Philadelphia, throwing away the revolver and the remaining bullets at a point on the road to Kennett Square where they were later found by the police. Parking the car three blocks away, he went home and put the car keys, with the box of bullets, in the top of the toilet, where they were later found by the police.

The defendant was in due course arrested, brought to trial, convicted of murder in the first degree and sentenced to death.

We take up in order the six questions above listed.

██ I. Was the evidence sufficient to justify the verdict? Defendant's counsel argues earnestly that the State proved only a case of second degree murder—a crime committed suddenly, on the slightest of provocation in hot blood induced by a quarrel. We cannot agree. Although the jury might have found the defendant's act was a rash impulsive one, done without reflection or deliberation, and hence a case of implied and not express malice, the evidence is also consistent with that deliberation or "cold blood" which, coupled with an intention to kill, would stamp the crime as first degree murder. The defendant may have still been to some extent under the influence of alcohol or drugs, but his own testimony tends to show that when he reached the Copper house he was in full possession of his faculties. On the way from Kennett Square to Hockessin he had loaded the revolver. Admittedly he shot the deceased twice while the latter was walking away from him to the bedroom. His conduct immediately after the shooting—the assault on Belle Copper, the visit to the porch to determine whether the shots had been

heard, his reloading of the revolver, his further assault on Belle Copper, his search for the car keys—taken as a whole, affords some evidence of the state of his mind immediately before he shot and killed Copper, and indicates that the whole course of action may have been deliberate. The jury was not required to believe his statement that he did not realize what he was doing. The jury could have found, on the evidence, that the defendant, in an ugly mood from drink, but fully understanding what he was doing, had determined to get a ride to Wilmington and that on being refused he was ready to kill Copper and take his car, and that his act in shooting Copper was, though sudden, a deliberate one. We do not say that this is the necessary interpretation of the facts; we do say it is a reasonably possible one. The issue was one peculiarly for the jury to resolve. *State v. Till, Houst. Cr Cas.* 233, involved a physical assault by the deceased upon the defendant and is not in point. We have carefully read the record and conclude that the court below was correct in submitting to the jury the issue of first degree murder.

II. Did the court err in admitting, over objection, evidence of the assaults on Belle Copper after the killing of Jack Copper?

Defendant's counsel cite to us the well-established rule that evidence of other crimes is not, in general, admissible to prove the commission of the offense charged. *State v. Greco, 7 Boyce* 140, 104 *A.* 637; *Garboctowski v. State, 2 W. W. Harr.* 386, 123 *A.* 395, and note. Conceding that there are exceptions to this rule, e. g., where intent, identity, or a common scheme is required to be proved, defendant says that the instant case does not fall within any such recognized exception; and further argues that even if the evidence was admissible the jury should have been cautioned that it did not constitute substantive proof of the crime charged and was introduced for a limited purpose only.

We hold the evidence admissible. The applicable rule is stated by *Wigmore (Vol.* I, *sec.* 218) as follows: "There is, how-

ever, an additional class of cases in which the misconduct of a defendant may be received, irrespective of any bearing on character and yet not as evidential of one of the above matters (design, motive or the like), or as relevant to any particular subsidiary proposition. That class includes other criminal acts which are an inseparable part of the whole deed."

Such evidence is not one of the exceptions to the general rule; it is admitted *ex necessitate rei,* since the two crimes constitute proof of one transaction, and proof of one necessitates proof of the other. *State v. Russ,* 4 *W. W. Harr.* 379, 153 *A.* 545; *Garboctowski v. State, supra; Underhill, Crim. Evid. (4th Ed.),* *sec.* 182. The cases supporting this rule are so numerous that extended quotation is unnecessary. See for example *Commonwealth v. Coles,* 265 *Pa.* 362, 108 *A.* 826; *Seams v State,* 84 *Ala.* 410, 4 *So.* 521; *State v. Vaughan,* 200 *Mo.* 1, 98 *S. W.* 2; *People v. Pallister,* 138 *N. Y.* 601, 33 *N. E.* 741; *People v. Manasse,* 153 *Cal.* 10, 94 *P.* 92; *May v. Commonwealth,* 153 *Ky.* 141, 154 *S. W.* 1074. In the case at bar the shooting of Belle Copper, as well as the robbery and larceny committed by defendant, were all parts of an inseparable criminal transaction which the State was entitled to lay before the jury. If one chooses so to enmesh one crime with another that intelligent proof of one cannot be admitted without proof of the other, he must bear the consequences of such proof. The cases cited by defendant's counsel (with the possible exception of *State v. Taylor,* 7 *Idaho* 134, 61 *P.* 288) do not touch this point.

Moreover, evidence of this nature, being admissible, as we have said, from the necessitiy of the case, is not admitted for a limited purpose only and hence no qualifying instruction to the jury is required. *Cf. State v. Russ, supra.*

We find no error in the admission or use of the evidence of the second assault.

III. Were photographs of the scene of the crime properly admitted?

The State introduced over objection photographs of the interior of the Copper house, showing the body of the deceased lying face downward, the head and the greater portion of the body lying in the bedroom. Defendant's counsel argues that these photographs were not "substantially necessary to show material facts or conditions", and that they tended to inflame the jury.

We think the point without merit. The admission of photographs of this character rests largely in the discretion of the trial court. *Wigmore on Evidence, Vol. IV, sec.* 1157; 2 *Wharton, Crim. Evid., sec.* 774. We have examined the photographs and are satisfied that the court did not abuse that discretion. The photographs were clearly material, since the position of the body after the killing and the location of the wounds were mute evidence that deceased was shot from behind. Nor can they be said to be inflammatory. We find no error in their admission.

IV. Did the trial court err in submitting the case to the jury in the evening, after the usual time of adjournment?

Defendant's counsel suggests that no capital case should be given to a jury in the evening; and, in addition, that the action of the court in this case constituted coercion in that the effect was to induce the jury to arrive at an early verdict.

That the time when a case should be submitted to the jury is a matter within the discretion of the trial court is beyond doubt. That question is not reviewable here unless there appear circumstances showing an abuse of discretion amounting to a coercion of the jury that might affect the verdict.

We have read the colloquy between the presiding judge and the foreman of the jury on the afternoon of the second day of the trial with respect to continuing the session of the court in the evening or recessing the court until the following day. We find nothing whatever in the record even remotely

suggestive of coercion. On the contrary, the decision to proceed with the case was arrived at only after the jury's convenience had been consulted and only after the foreman had expressly said they were willing to stay. The contention is without merit.

V. Was the verdict "guilty as indicted" a nullity?

Defendant's contention is that the verdict did not ascertain the degree of murder in accordance with the statute. This contention was not made below, but we consider it on its merits.

*Section* 5160 *of the Revised Code of Delaware*, 1935, requires that the jury, upon the trial of an indictment for murder, if they find the defendant guilty, "shall inquire, and by their verdict ascertain whether he be guilty of murder of the first or second degree". The defendant was indicted for murder in the first degree. The verdict was taken in the manner established in this State by long usage, as follows:

"The Clerk: How say you, Madam Foreman, do you find John H. Bantum, the prisoner at the bar, guilty in manner and form as he stands indicted or not guilty?

"The Foreman: We find him guilty as indicted.

"The Clerk: Hearken to your verdict as the Court has recorded it, your Foreman says you find John H. Bantum, the defendant, guilty in manner and form as he stands indicted, so say you."

On demand of the defendant's counsel the jury was then polled, each juror answering that that was his verdict.

We think that the verdict did ascertain the degree of murder to be murder in the first degree. The applicable statute, *Rev. Code* 1935, *Sec.* 5317, requires the different degrees of murder to be distinguished in indictments, and the indictment in this case charged the defendant, in terms, with express malice aforethought and murder in the first degree. The verdict "guilty as indicted" was therefore a verdict that the defendant was guilty

of murder in the first degree and satisfied the statute. See *Johnson v. Commonwealth*, 24 *Pa.* 386, and cases cited.

We think this contention without substance.

VI.  Was there error in the court's charge to the jury?

Defendant assails the charge in several particulars.

First, defendant prayed the court to charge as follows: "When the fact of killing as charged is shown unaccompanied by circumstances of justification, excuse, or extenuation, the law presumes that the homicide was committed with malice until the contrary appears from the evidence, yet the law goes no further than to imply malice and therefore, the legal presumption in such a case is no more than that the killing is murder in the second degree under our statute."

Although this charge might be appropriate under some circumstances, we think the court properly refused it in this case. As we have said, there were in evidence certain facts tending to prove that the defendant's malice was express. The State's case was not built upon a presumption arising out of an unexplained killing and hence the charge was not adapted to the facts. In this case the requested charge might well have confused the jury and led it to conclude that, notwithstanding this evidence, the defendant's crime was, under applicable rules of law, no more than second degree murder. The substantive right which the defendant sought by his prayer to protect would in any event have been adequately guarded by a proper charge as to the necessity of proving the elements of express malice by circumstances outside the fact of killing, to which the requested charge would have added nothing. The requested charge was not an appropriate one, and was correctly refused.

Second, defendant asserts error in the following portion of the charge: "No specific length of time is necessary to make an act a deliberate act. A deliberate act may be very sudden. If the accused, before committing the fatal act, had

made up his mind to kill the deceased, even though his design to kill was but the conception and intention of a moment, it is as deliberate in law as if it had been the design of hours, and if the accused had time for reflection and thought, and did not think, and did then intend to kill, and did kill the deceased, it is just as much a case of deliberate, premeditated killing, as if he had intended it for a length of time." (*R.* 280)

Defendant says that it is error to charge that a deliberate act may be "but the conception and intention of a moment". We do not think so. The rapidity of the action of the mind is not susceptible of measurement, and the existence of the sedate and deliberate mind as a necessary element of first degree murder is peculiarly a question for the jury. The assailed charge is, as is conceded by defendant, settled Delaware law. *Bullock v. U. S.*, 74 *App. D. C.* 220, 122 *F.* 2d 213, and *Jones v. U. S.*, (9 *Cir.*) 175 *F.* 2d 544, appear to hold otherwise; but we think them contrary to the weight of authority. We deal more fully later with this portion of the charge.

Defendant notices the reported error in the interpolation of the word "not" in the phrase "did not think" in the second sentence of the quoted portion of the charge. It is at least doubtful whether this is more than a stenographic error; but we need not consider it further in view of our conclusion that the case must, for other error in the charge, be reversed.

Third, defendant attacks the following portion of the charge: "The deliberate selection and use of a deadly weapon, knowing it to be such, is a circumstance which indicates a formed design to kill in the absence of evidence showing the contrary intent." (*R.* 280)

Defendant says that the use of the word "indicates" instead of the phrase (found in some Delaware cases) "may indicate" constituted, in effect, a charge that the use of a deadly weapon indicated that the defendant was guilty of first degree murder. We think the distinction of no substance. The intentional use of

a deadly weapon upon the body of another is evidence, i. e., "indicates" an intent to kill or to do great bodily harm in the absence of evidence to the contrary. The court did not charge, as defendant assumes, that it indicates first degree murder, but only that it indicates an intent to kill. Intent to kill or to do great bodily harm (as hereafter more fully developed) is but one element of that crime. Defendant's suggestion that the charge "verges perilously close" to comment on the facts is likewise without substance. The charge embodied only an inference of fact which the law itself draws—which, indeed, is but common sense.

Defendant further assails this portion of the charge on the ground that the words "deliberate selection" imply a choice, that is, a choice between available weapons; that there is no evidence in the record of any such selection or choice; and that it was error to charge upon a state of facts which did not exist, since the jury might have concluded from the charge that the court believed that there was evidence in the record of deliberate selection. If so, argues defendant, the court in effect told the jury that the supposed evidence justified in an inference of express malice, that is, of first degree murder.

We agree with defendant's contention that "selection" means "choice", and that the record is bare of any evidence of such choice. We also agree with defendant's counsel that this portion of the charge was not, as suggested by the Attorney General, a mere illustration of the kind of circumstance that indicates express malice. It was a charge on a vital point in the case. Hence we conclude that it was erroneous. It is true that this charge has been consistently given in this State by the trial courts over a very long period of time in cases of homicide with a deadly weapon and has unfortunately become stereotyped. It has never been approved as a general charge in all such cases by the Supreme Court. The history of its development demonstrates the error into which the lower courts have fallen.

The first reported charges in Delaware under the statute were carefully worded so as to convey to the jury the necessity for a deliberate choice to have been made. Chief Justice Gilpin, in *State v. Gardner, Houst. Cr. Cas.* 146, 148 said: "As for instance where two persons become involved in mutual combat and one of them in the midst of it turns to seize a weapon or a dangerous instrument from a number near at hand, and in so doing he exhibits sufficient thought, reflection and discrimination to choose and select from them one in particular more dangerous, and deadly than the rest, and shoots, strikes or stabs the other with it, although done quickly and on the spur of the moment, it may show such deliberation and formed design to kill or do the other some great bodily harm with it and death results from it, as will constitute in contemplation of law murder with express malice aforethought, and the crime of murder of the first degree under our statute." See also the charge of Chief Justice Comegys in *State v. Rhodes, Houst. Cr. Cas.* 476, 497, and still later in *State v. Davis,* 9 *Houst.* 407, 409.

In *State v. Gardner, supra,* defendant selected a sharp-pointed knife out of a case of kitchen knives; in *State v. Rhodes, supra,* defendant put down a stone and picked up a barlow knife. If there were evidence in this case, for example, that Bantum, having quarreled with the deceased, went to his automobile outside, where there were a knife and numerous tools at hand, but, nevertheless, took from the glove pocket a pistol, with which he returned and shot the deceased, there would have been in the record evidence of the deliberate selection of a deadly weapon.

We cannot find any evidence of a "deliberate selection" in this case. The deputy attorney general, opening the prosecution, said that defendant "reached down and grabbed that revolver and shot John Copper twice in the back". The State's terse characterization of the act appears to be justified by the testimony. As we have said, defendant had the revolver in his belt concealed under his jacket. There is nothing in the record in-

dicating that any other weapon was at hand or in any way available.

Moreover, in the phrase "deliberate selection and·use" the adjective may be read as modifying the noun "use" as well as the noun "selection". Such an implication is not justified by the evidence in the case.

The deliberate use of a deadly weapon in common parlance means something beyond the bare employment of it. It means that the manner of the weapon's use is the significant thing. Thus, in the case at bar if there were testimony that Bantum had been observed after or during the quarrel carefully and without external show of passion to load the cartridge clip, and then, taking careful aim, to fire the shots, evidence of those external circumstances would be proper evidence of a deliberate use, as opposed to the mere use, of the gun. Deliberate is a word of specific import in a charge on first degree murder; it is not to be treated as an epithet.

It is quite clear that the charge on "deliberate selection and use" was, originally, a charge embodying a legal inference of express malice aforethought. In a case where there exists evidence of deliberate selection and use such a charge, as given by Chief Justice Gilpin, is appropriate; in such a case as the present one, it is not.

It is also to be observed that there may be cases in which a charge on "deliberate selection" would be appropriate, but a charge on "deliberate use" would be unwarranted, and vice versa. The correctness of the charge in either case would depend upon whether it is adapted to the facts proved.

In the instant case the court did not charge in the language of the *Gardner* case that the deliberate selection and use of a deadly weapon raises an inference of express malice, but only that it indicates an intent to kill. The State was entitled to a charge that the intentional use of a deadly weapon upon the

body of another is evidence of an intention to kill or to do great bodily harm in the absence of evidence to the contrary; but even so, when the language is taken in conjunction with the remainder of the charge on the issue of deliberation (hereafter discussed), we cannot but conclude that in this case the jury may have been led to believe that the necessary element of deliberation could be inferred from a supposed selection of the weapon, and that prejudice to the defendant resulted. The charge was not adapted to the proof and should not have been given.

Finally defendant urges, generally, that the charge, taken as a whole, was confusing and might have misled the jury in that the elements of express malice, i.e., first degree murder, and the proof necessary to sustain it, were not adequately and clearly set forth.

We are compelled to the conclusion that the defendant's contention is well founded. The charge, while in many respects embodying sound and settled principles of law, did not, we think, clearly set forth and distinguish the elements of first degree murder, and the proof required to sustain the charge. Before analysis of the specific portions of the charge, a review of the Delaware law relating to homicide is necessary.

At common law, and in Delaware until 1852, murder was a single crime. The form of our original statute dividing murder into degrees has never been altered and appears in the *Revised Code of Delaware,* 1935, as follows: "5157. Sec. 1. Murder; First Degree; Penalty:—Whoever shall commit the crime of murder with express malice aforethought, or in perpetrating, or attempting to perpetrate any crime punishable with death, shall be deemed guilty of murder of the first degree and of felony, and shall suffer death."[1]

---

[1]We are in this opinion discussing only express malice, and not that other type of statutory first degree murder where it was done in the perpetration or attempted perpetration of some other crime punishable by death.

Although the original penalty for second degree murder has since been modified by eliminating the pillory and whipping, the crime itself was then defined as it now appears in *Revised Code of Delaware*, 1935, in the following language: "5158. Sec. 2. Murder; Second Degree; Penalty:—Whoever shall commit the crime of murder otherwise than is set forth in the preceding section, shall be deemed guilty of murder of the second degree * * * *."

The use of the concept of express malice to distinguish between the degrees of murder was not based upon any difference in the degrees of guilt; it was adopted because it constituted a device for tempering the severity of administering capital punishment in all cases of murder. *State v. Buchanan, Houst. Cr. Cas.* 79; *State v. Till, Houst. Cr. Cas.* 233.

This device has sometimes been regarded as an unfortunate choice. *State v. Thomas, Houst. Cr. Cas.* 511, 523; *Annotation,* 38 *L. R. A. (N. S.)* 1070, 1095. At common law, of course, the distinction between express and implied malice was of academic interest only, and was therefore much more interesting to scholars than to courts. Further, this distinction was adopted in very few American jurisdictions as a basis for dividing murder into degrees. In fact, in modern times, at least, we have noted no sign of its being so employed in any states except Maine, Texas, and Delaware. See *Bowlby's Wharton on Homicide,* (3rd Ed.), pp. 147-151, 167-171. The language of the statutes of the other states is, or at least purports to be, to some degree self-explanatory, while our statute simply lifts a troublesome abstract term of art from the common law and causes it to spell the difference between life and death.

In 1852, as now, the court could expect to find no answer in any modern development of the law; the court's duty was and is to determine and explain what express malice aforethought meant at common law. Our courts at once adopted the definition of express malice given in *Blackstone's Commentaries,*

*Vol. IV*, p. 199. *State v. Green, Houst. Cr. Cas.* 217, 225. Many Delaware courts elected to use Blackstone's language, and no Delaware court has disapproved it. See the large collection of citations gathered in a footnote to 38 *L. R. A. (N. S.)* p. 1073.

Blackstone's definition of murder is as follows: "* * * the killing must be committed *with malice aforethought*, to make it the crime of murder. This is the grand criterion which now distinguishes murder from other killing: and this malice prepense, *malitia praecogitata*, is not so properly spite or malevolence to the deceased in particular, as any evil design in general: the dictate of a wicked, depraved, and malignant heart: *un disposition a faire un male chose;* and it may be either *express* or *implied* in law. Express malice is when one, with a sedate deliberate mind and formed design, doth kill another: which formed design is evidenced by external circumstances discovering that inward intention; as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." (*IV Blackstone,* 198.)

Thus, in addition to malice (which is common to both degrees of murder) there must exist the elements of formed design or intention to kill or to do great bodily harm and the sedate and deliberate mind of which the intention to kill or do great bodily harm is the product.[2] Each of these elements must be proved by external circumstances, that is by circumstances other than the mere fact of the killing which fact, at common law, itself gave rise to an inference of malice. (*IV Blackstone,* 201.)[3] Each element, together with malice, must be present and proved beyond a reasonable doubt.

---

[2]The design "is not confined to an intention to take away the life of the deceased, but includes an intent to do any unlawful act, which may probably end in depriving the party of life." *Roscoe,* 707; 2 *Stark.* 711; *IV Blackstone,* 199-200; *State v. Jones, Houst. Cr. Cas.* 21, 23; *State v. Draper, Houst. Cr. Cas.* 291, 298; *McCoy v. State,* 25 *Tex.* 33; *Tooney v. State,* 5 *Tex. Cr. App.* 163, 189.

[3]Whether the common law inference of malice from the killing alone is still the law we do not decide. See *I Jones Evid.,* Sec. 137.

In the instant case malice was concededly present, since no legal justification or provocation was shown. The formed design—more simply, the intent to kill or to do great bodily harm—was inferable from the intentional use of a deadly weapon upon the body of the deceased, since, in the absence of circumstances showing the contrary, one who uses a deadly weapon upon the body of another must be presumed to know that death is likely to ensue and to intend the natural and probable consequence of his act. The existence of a sedate and deliberate mind can, of course, be shown only circumstantially. As we have shown, there was evidence from which, taken as a whole, the jury could find that it existed. On the other hand the jury might have found the act of the defendant to be, as his counsel contends, a rash impulsive one, which, though embodying an intent to kill, was so sudden as to have permitted no instant for reflection. The issue was one for the jury; but it was the crucial one. Indeed, aside from the question of intoxication or the influence of drugs, there was no other issue in the case. It was most important that it be submitted to the jury in clear and unmistakable terms. On this point, we think, the court's charge was inadequate and indeed misleading.

We turn to analysis of the charge.

After correctly defining malice the court proceeded to charge:

"Express or actual malice is usually shown by something that the accused said or did before the killing, or some other circumstances which indicate that the person had the purpose and intention to kill when he made the fatal attack.

"Implied or constructive malice must be shown by the character of the fatal attack and the surrounding circumstances. Where there is proved no fact or circumstance indicating a purpose and intention to kill, yet where the fatal act was unlawful and cruel and voluntarily committed, without adequate provocation and in circumstances showing a wicked indifference to

human life, or with a reckless disregard of the consequences, the law implies or infers malice." (*R.* 279)

■ The first quoted paragraph in effect equates express malice with intention to kill, which is erroneous. Intent to kill may be consistent with implied malice as where the killing, though intentional, is a rash impulsive act without deliberation or sedate mind; and it is always present in voluntary manslaughter— a purposeful killing in the heat of passion under legal provocation. The second sentence of the second quoted paragraph contains the same thought, that is, that the intention to kill is the one essential element of express malice.

■ Moreover, the use of the adverb "usually" in connection with the proof of external circumstances necessary to establish the elements of express malice raised an inference, contrary to the law, that sometimes such proof is not required. This is likewise erroneous.

■ Upon the issue of intoxication the court charged: "In order, however, to reduce the grade of the crime, the jury must be satisfied that the prisoner was so intoxicated as to be utterly incapable of forming a specific intent or a formed design to kill; for a person who is intoxicated may yet be capable of premeditation and deliberation, and an intoxicated man who commits a wrongful act wilfully and with premeditation is as guilty in the eyes of the law as if he had been sober." (*R.* 283)

Again the two elements of intention to kill and the sedate and deliberate mind are confusingly blended. If the jury believed that because of intoxication the defendant was incapable *either* of the intention to kill or to do great bodily harm *or* the necessary calmness and deliberation, he may not be found guilty of first degree murder. The effect of the charge was to permit the jury to find express malice if *either* element were present; whereas both must be present as seperate elements of the crime. *Cf. State v. Brewer*, (1934) 218 *Iowa* 1287, 254 *N. W.* 834, 838.

It is true that in other portions of the charge the distinction was preserved (*R.* 280-281); but we cannot but conclude that the errors pointed out may have led the jury to believe that intention to kill alone, or deliberation alone, was sufficient to sustain the State's case.

In reaching the conclusion that the case must be reversed we are fully sensible of the fact that the language of the charge to the jury finds some support in many reported cases in our trial courts over a long period of time in charges given by many able judges. Even so, we think that the protection of the defendant's rights is a consideration far overweighing the sanction of time. It is also to be observed that only since 1897 has there been an opportunity for review of criminal cases by an appellate court, and that even since adoption of the Constitution of 1897 appeals in capital cases have been rare. In none of the decisions on appeal do we find any discussion of the charge to the jury in a capital case. Thus our trial courts have been unable to look to final pronouncements of a court of last resort in this field of the law.

We think the fundamental error into which our trial courts have often drifted, particularly in homicide cases, is the failure to adapt the charge to the facts. There has developed a tendency often to include in the charge abstract principles of law not directly related to the facts, and also for the charge to become unnecessarily repetitious. As an example of the former tendency, we find that in the instant case, as in other cases in the past, a charge on manslaughter was given without any qualifying instruction although there was no issue of manslaughter in the case. Under the applicable statute, *Revised Code,* 1935, *Sec.* 5315, the jury must be instructed that they may return a verdict of either degree of murder or of manslaughter, or a verdict of not guilty, but the court, in such a case as this, should instruct the jury that there is no evidence and hence no issue of manslaughter in the case. *State v. Carey,* 6 *W. W. Harr.* 521, 178 *A.* 877, so holds and we think it sound law.

For the reasons above given the verdict must be set aside and the cause remanded to the Superior Court for a new trial.