**Joseph Stanley BROWN, Appellant,**

**v.**

**STATE of Delaware, Appellee.**

Supreme Court of Delaware.

June 29, 1966.

John M. Bader and Ciro Poppiti, Wilmington, for appellant.

Michael N. Castle, Deputy Atty. Gen., Wilmington, for the State.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

WOLCOTT, Chief Justice.

This is an appeal from a conviction of First Degree Murder. The appellant (hereafter "Brown") was recommended to the mercy of the court and, consequently, was sentenced to life imprisonment.

Brown asserts three points of alleged error which, he says, should lead to a reversal of his conviction, viz.:

1. That there was insufficient evidence to support a conviction of murder in the first degree;

2. That it was error to instruct the jury, in effect, that premeditation may involve only a moment's reflection;

3. That it was error to admit in evidence a written statement signed by Brown because he was not furnished assistance of counsel as requested, and because he was not effectively warned of his right to remain silent.

We take up in order these three points.

*Was the evidence sufficient to support the verdict?*

11 Del.C., § 571 provides that whoever commits the crime of murder with express malice aforethought shall be guilty of murder in the first degree. Express malice aforethought requires the existence of a formed design to kill or do great bodily harm determined upon with a sedate, deliberate mind. Bantum v. State, 7 Terry 497, 85 A.2d 741. Brown concedes that the charge to the jury in his case properly instructed it as to murder in the first degree.

Brown was convicted of the murder of Myrtle Cannon, a woman with whom he had lived for a period of time in the near past, but from whom he was separated at the time of the killing. There is no direct evidence as to the facts leading up to the actual shooting except for Brown's signed statement taken by the police, and except for his testimony from the stand largely to the same effect. Both his statement and testimony were intended by him to be exculpatory, explaining the killing as accidental.

The State contends, however, that evidence produced by it as to antecedent threats and mistreatment of the victim by Brown, coupled with the circumstantial evidence of the crime, itself, and the nature of the murder weapon, justify the conclusion that Brown murdered Myrtle Cannon as a result of a formed design to kill, arrived at with a sedate, deliberate mind.

Brown's version of the occurrence in both his written statement and testimony is that early in the day of August 31 he came to Wilmington from Northeast, Maryland, where he was then living with his mother, and took a bus to Chester, Pennsylvania. In the lavatory of a tavern in that city, he met a man, unknown to him, from whom he purchased the gun, the murder weapon, with the intention of reselling it at a profit. He then returned to Wilmington, had some dinner, a few drinks after dinner, and later in the evening, while driving a borrowed car on an errand for the owner, casually met Myrtle Cannon who was riding in a car with an unknown man.

At her invitation, he followed the car in which she was riding to a house on Rose

Lane near New Castle, where she was living with another man. He got out of his car and walked with Myrtle to the door of the house. At her request, he kissed her. During the kiss she pressed against him and felt the gun he had placed in his belt on the left side.

Myrtle then asked to see the gun but he refused to let her because it was loaded. Myrtle, who at the time was drunk, grabbed the gun with her right hand and pulled it from his belt. He grabbed at the gun with both his hands and they struggled for it. In the course of the struggle, five shots were discharged. Brown then left Myrtle slumped on her doorstep and returned to Wilmington in the car which had been loaned to him.

At a tavern in Wilmington he met a friend of his who had a car. He asked him to drive him to Delaware Hospital where he inquired about Myrtle with no success. He was then driven past Myrtle's house but did not stop because of a crowd of people in front. He was then driven, at his request, to Northeast, Maryland, directing his friend to stop some distance from his mother's home. He walked there but did not go in because of the presence of Maryland State Police. He then went to Rising Sun, Maryland, and was taken into custody by a Maryland State Trooper four days later.

The foregoing is Brown's version of the circumstances. It is taken from his written statement and his testimony from the stand. By his version, it would appear that the killing of Myrtle Cannon was accidental.

The State in support of the murder charge called several witnesses. It called Leothas Chapman, the fifteen-year-old son of Myrtle Cannon who lived with her and a George Green in the house on the steps of which she was killed. He testified that on the night of August 31, about 11:15 p. m., he was at home watching television and had gone back to the kitchen for a sandwich, and was re-entering the front room when he heard high heels coming up the sidewalk

and then a banging on the front door which was locked, and his mother calling his name three or four times. He started for the door and heard a shot and a scream from his mother, followed by several more shots in rapid succession. The front door had a glass window in it and through it the son saw Brown running toward a car. The son opened the door and found his mother lying on the front steps.

A witness, Mary Ashley, testified that some time about 11:15 p. m. on the night in question she was walking along Church Street in Wilmington, and that Brown in a car drew up along the sidewalk where she was. She stated that he said, "I did it. I killed Myrtle. I had to."

A witness, William Thompson, Brown's friend who finally drove him to Northeast, testified that in the course of several hours Brown told him that his wife had been shot five times and that he didn't know who did it.

The State further called witnesses who testified as to various occasions on which the prisoner had abused, struck and choked Myrtle Cannon, and, also, as to her complaint that Brown bothered her and should be made to leave her alone.

We think if the foregoing had been all of the evidence offered by the State, the issue of first degree murder should probably not have been submitted to the jury. However, other evidence, largely circumstantial, not only destroys Brown's contention of accidental death completely but, we think, is inconsistent with any verdict but that of first degree murder.

Brown testified that Myrtle Cannon pulled the gun from his belt with her right hand, that he grabbed it with his two hands, and in the following struggle the gun discharged. From the autopsy it appears that Myrtle Cannon received four bullet wounds, two in her left arm below the elbow, and two in her right arm below the elbow. At least three of these bullets then continued on into her body resulting

in her death. The fifth shot from the gun ricocheted along a brick wall and spent itself in the ground. We think the location of the wounds, themselves, throw considerable doubt on Brown's story, for it is difficult to reconcile them with his statement that she was holding the gun in her right hand, presumably by the butt, and yet was shot twice in both forearms.

Even more damaging to Brown's story is the nature of the murder weapon, itself. The State called as a witness Edward Baker who had employed Brown for about ten days in the early part of August. This witness was in charge of fence construction on the North East Expressway and, since the area was infested with snakes, he carried a gun in the glove compartment of his car. He testified that Brown had seen the gun and that it had been stolen from his car on August 19. He identified positively the murder weapon as the gun which had been stolen from his car.

The gun in question is a single-action .22 calibre Ruger revolver. This type of revolver may be fired only when the hammer is at full cock and the trigger is depressed. There is no other way in which it can be discharged. It may be fired rapidly only by holding the trigger back and striking the hammer with the heel of the other hand so as to put the hammer in the full-cock position and immediately release it.

The very nature of the weapon, itself, makes Brown's contention of an accidental shooting incapable of belief. In the first place, it would be almost impossible to discharge a weapon of this type in a struggle for possession of it. In the second place, even though one accidental discharge might in some inconceivable fashion take place, it strains credulity to assume more than one accidental discharge. In the third place, Brown on the stand stated that after the first shot he saw the fire continue to come from the gun which he described as "still pointed towards her." This could have been observed by him only if some amount

of space separated the two of them which, we think, precludes the idea of a struggle.

Thus it is, we think, that it was impossible for the gun to have been discharged accidentally in the course of a struggle. The only rational explanation of the killing is that Brown, himself, fired the shots as rapidly as he could, and since the sequence is described by all witnesses who heard them as rapid, it follows that he emptied the gun mostly into the body of Myrtle Cannon by "fanning" the hammer. His testimony that he saw the fire coming out of the weapon can have only one meaning—that at least some distance separated him from Myrtle Cannon; that he held the gun, and that he fired the gun deliberately.

■ We think, therefore, that the jury could properly have concluded that Brown deliberately shot Myrtle Cannon with the intent to kill her, or to do her great bodily harm. The use of the deadly weapon, without any showing of provocation, satisfied the requirement that malice be present, and the formed design or the intent to kill is established by the deliberate use of a deadly weapon upon another. The element of premeditation could have been inferred by the jury from the facts of his antecedent mistreatment of Myrtle Cannon; the carrying of the gun upon his person from Northeast, for the jury necessarily must have rejected his story that he purchased it in Chester on that day; the emptying of the gun into her body, and his subsequent flight. As we pointed out in Bantum v. State, supra, deliberation or "cold blood" coupled with an intent to kill stamps the crime as first degree murder.

■ We are of the opinion that there was sufficient evidence to sustain a conviction of first degree murder.

*May premeditation involve only a moment's reflection?*

■ The trial judge instructed the jury in effect that premeditation may involve only a moment's reflection, and that a de-

liberate act may be the conception and intention of a moment. This instruction is assigned as error on the theory that to speak of premeditation or deliberation as instantaneous and as taking no appreciable time is a contradiction in terms and is accordingly, against principle and reason.

In Bantum v. State, supra, we specifically approved the instruction given, pointing out that it had long been the law of Delaware and was in accord with the weight of authority. Brown asks us to overrule the *Bantum* case, relying primarily upon Bullock v. United States, 74 App.D.C. 220, 122 F.2d 213, which we refused to follow in that case. Under the circumstances, we think the point is settled and we decline to reconsider and overrule the *Bantum* case.

*Was the admission of Brown's signed statement error?*

The statement was not a confession. It was in fact exculpatory. Except for the fact that Brown admits possession of the murder weapon and his presence at the scene of the crime, the statement adds nothing to the proof of the State's case. We note further that on the stand Brown corroborated in detail the contents of his written statement, with the exception of one or two minor discrepancies.

The circumstances surrounding the taking of the statement are briefly as follows: When Brown was brought to Delaware from Maryland, he was questioned orally by a State Trooper. Following this oral questioning, he was then warned that he did not have to make any statement and that anything he might say could be used against him at his subsequent trial. Brown then voluntarily made the statement subsequently admitted into evidence. The manner of making the written statement was that the questioning officer asked a question which was then typed. Brown then gave his answer. His own words were

then typed following the typed question. At the end of the interrogation Brown read over the typed questions and answers, and signed the statement.

When the State offered the written statement in evidence, Brown's counsel examined the officer who took the statement on *voir dire*. This took place in the presence of the jury.[1] At the conclusion of this examination, counsel made no objection to the admission of the written statement in evidence. During the course of the *voir dire* examination counsel's questions were directed to the voluntariness of Brown's statement and as to whether or not he had asked for counsel prior to making the statement. Brown testified that he requested counsel but the police officer contradicted him.

■ Brown now seeks to have the admission of the statement ruled to be prejudicial error. No contention is made that any physical or mental coercion was used by the police to obtain Brown's statement, but it is argued that Brown was not warned of his constitutional rights prior to his oral examination which preceded the taking of the written statement, and that, accordingly, the admission into evidence of the written statement constitutes error because he was not effectively warned of his constitutional right to remain silent. The difficulty with the argument is that concededly he was so warned prior to making the written statement, and no oral statement made by him prior to the warning was offered or admitted into evidence. There was, therefore, an effective waiver by Brown of his right to remain silent. Halko v. State, Del., 209 A.2d 895.

The main argument under this point, however, is based upon Escobedo v. United States, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977, and United States ex rel. Russo v. State of New Jersey (3rd Cir.) 351 F.2d

---

1. The *voir dire* was in the presence of the jury with the consent of defense counsel. Under recent Supreme Court of

U. S. decisions, however, the better practice would seem to be to conduct a *voir dire* in the absence of the jury.

429,[2] decided upon the authority of the *Escobedo* case. The contention is that these two cases require that when a criminal investigation reaches the accusatory as opposed to the investigatory stage, it becomes the duty of the State to affirmatively inform an accused of his right to counsel, and that the failure to so inform an accused makes a confession obtained as a result of ensuing interrogation inadmissible in evidence at his trial. Admittedly, in Brown's case he was not so informed. Brown also contends that under the *Escobedo* and *Russo* cases, the failure to furnish counsel (according to his version of the facts which we accept for present purposes) made his written statement inadmissible.

We heard argument in this appeal prior to acceptance by the Supreme Court of the United States of five petitions for certiorari[3] which collectively involved the scope of the decision in the *Escobedo* case. After we learned of these five cases pending before the Supreme Court, we withheld decision in this appeal to await clarification by the Supreme Court of the unclear situation which followed as the aftermath of the *Escobedo* case. On June 13, 1966 an opinion was handed down by the Supreme Court in Nos. 584, 759, 760 and 761, 86 S.Ct. 1602. On June 20, 1966 an opinion was handed down in No. 762, 86 S.Ct. 1772.

■ In Johnson v. State of New Jersey, 384 U. S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, the Supreme Court held that the rule of the *Escobedo* case affected only cases in which the trial began after June 22, 1964, the date of the *Escobedo* decision, and that the rule of Miranda v. State of Arizona, which further elaborates on the *Escobedo* rule, applies only to cases in which the trial began after June 13, 1966, the date of the *Miranda* decision. Since the trial of Brown

commenced on April 20, 1964 and went over to the following day, by reason of the *Johnson* case, the *Escobedo* case and the *Russo* case, decided on its authority, have no application in the appeal before us.

■ In the *Johnson* case it is made clear that with respect to criminal trials commencing prior to June 22, 1964 the question to be determined with respect to the admission into evidence of an incriminating statement obtained as a result of police interrogation is whether or not the statement was made voluntarily. We test the admissibility of this statement in accordance with the rules prevailing in Delaware prior to June 22, 1964. As of that time, Delaware had no requirement that counsel be furnished prior to arraignment. In the appeal before us a *voir dire* examination was conducted in order to determine whether or not Brown voluntarily made his written statement. At the conclusion of the *voir dire* examination, counsel made no objection to its admission into evidence. His actual statement was: "Your Honor, this statement being exculpatory in nature, I feel that the State has laid sufficient foundation to offer it, so I'm not going to make any objection to it."

We think that Brown's statement satisfies the requirement of voluntariness and was properly admitted into evidence. Brown was advised by the police of his right to remain silent and that if he made a statement it could be used against him. This being so, the police advised him of all his constitutional rights which the requirements of law prior to June 22, 1964 demanded. It therefore does not matter that he was not told that he could have a lawyer or whether he in fact asked for one. His statement was not coerced in any way.

The conviction below is affirmed.

**2.** On certiorari the judgment in the *Russo* case was vacated and the case remanded.

**3.** Miranda v. State of Arizona, No. 759, (Vignera v. New York, No. 760; West-

over v. U. S., No. 761; State of California v. Stewart, No. 584), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; Johnson v. State of New Jersey, No. 762, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 694.