THELMA DOROTHY POWELL, Defendant Below, Plaintiff in Error, v. THE STATE OF DELAWARE, Plaintiff Below, Defendant in Error.

(*February* 1, 1952.)

SOUTHERLAND, C. J., WOLCOTT and TUNNELL, J. J., sitting.

*Everett F. Warrington* for the plaintiff in error.

*John J. McNeilly,* Deputy Attorney-General, for the State.

Supreme Court, No. 7, September Session, 1951.

WOLCOTT, J.:

Thelma Dorothy Powell (hereinafter referred to as the defendant) was tried upon an indictment for murder in the first degree. The jury returned a verdict of guilty of murder in the second degree and recommended the defendant to the mercy of the court. The defendant moved to set aside the verdict and for a new trial. The trial court refused the motion for a new trial without opinion, one Judge dissenting. The defendant was thereupon sentenced to life imprisonment.

The facts of the case may be summarized as follows:

The defendant was married in 1935 and later widowed. Two daughters were born of her first marriage. Subsequently, she married a second time but, in August of 1949, she and her husband agreed to live apart and she established her residence with her two minor daughters in a cabin on the edge of a woods one and a half miles south of Georgetown. On occasion, her husband came to stay with her there.

In the early evening of June 9, 1951, the defendant went to Georgetown with her two daughters and, leaving the daughters in the care of a friend, went on to a drinking and dancing place in Maryland in the company of three men. While at this place, called The Star, she met Harry Shockley. In the course of the evening the three men who had taken her to The Star left, after arranging for the defendant to return to Georgetown with Shockley. Some time later, the deceased, Granville Brittingham, whom she had known prior to that time as a friend of her husband, asked her if he could return to Georgetown with her. The defendant told Brittingham that he would have to ask Shockley. Brittingham then arranged to return to Georgetown, where he lived, with Shockley and the defendant.

The trio left The Star for Georgetown shortly after midnight. Shockley was the driver and the defendant was sitting on the front seat between him and Brittingham. In the course of the ride, Brittingham made, on two occasions, improper advances toward the defendant, but she testified at the trial that she had no recollection of the trip back.

On their arrival in Georgetown, they went to the home of the defendant's friend and picked up her two daughters. They then drove out to a curb service restaurant and obtained coffee. While this was taking place, Shockley offered to take Brittingham to his home in Georgetown but Brittingham refused, stating that he wanted to go home with the defendant. Some discussion concerning this ensued, the defendant telling Brittingham that if he rode with them to her home he would have to return with Shockley.

They then drove to the defendant's cabin and, after obtaining a rifle, cartridges and a flashlight from the cabin, went to a small pond nearby and shot bullfrogs for an undisclosed period of time.

Some time between 2:00 and 3:00 A.M., the two men and the defendant returned to the defendant's cabin. The cabin contained a livingroom, kitchen and bedroom in which the two daughters had already retired. The defendant's bed was a daybed in the livingroom. Brittingham lay down on the daybed after having taken off his shoes. Shockley prepared to leave and called to him. Some discussion took place eventually culminating in an attempt by Shockley to get Brittingham off the daybed in order to take him home. When this took place, he struck at Shockley and Shockley left in anger. The defendant begged Shockley not to leave without Brittingham.

After the departure of Shockley, the defendant made repeated efforts to persuade Brittingham to leave. These repeated attempts are verified by the testimony of the two daughters of the defendant who testified for the State. Several times the defendant managed to get him up off the bed and started toward the outside door but each time he returned and laid down. Finally, the defendant told him that if he did not get up and leave, she would shoot him. To this he replied that if she was going to shoot him, to shoot him between the eyes. The defendant said she wouldn't do that but would shoot him enough to hurt him and make him leave.

Following this exchange, the defendant walked to a corner of the room diagonally opposite the daybed on which Brittingham was then sitting, picked up a loaded rifle and fired, intending, she testified, to hit his left arm.

The daybed on which Brittingham was sitting was against the outside wall and immediately to the right as one entered the outside door of the livingroom. Against the adjacent wall on the right was a library table opposite which the defendant was stand-

ing during the coloquy described and from which point she walked to the diagonally opposite corner to get the rifle.

The bullet fired by the defendant entered on the outer side of the deceased's left arm about three inches below the shoulder joint, was deflected and traveled inward, entered the deceased's chest between the third and fourth ribs, penetrated the heart and spent itself in the lower part of the abdomen.

Immediately after the shooting occurred, the defendant hurried to her nearest neighbor and asked him to call an ambulance because she had shot a man. At this time, the defendant was greatly excited and crying, repeating several times language to the effect that she had shot a man but did not think him badly hurt since she had shot him in the arm.

The evidence clearly discloses that the defendant had been drinking during the course of the evening. She testified, in fact, that she was probably intoxicated at the time she fired the shot which resulted in death. The general import of the record is to the effect that Brittingham, as well, was at least under the influence of alcohol, although his precise condition is not particularly clear.

On these facts, the case was submitted to the jury on the issue of first degree murder.

The defendant contends that there was no evidence to justify the submission to the jury of the issue of murder in the first degree and that, consequently, the submission of such issue was prejudicial and therefore constituted reversible error.

We do not agree with the defendant's argument in this respect. As made, the argument is twofold. The first point is that the defendant lacked the specific intent required to support a conviction of murder in the first degree since she did not intend to kill the deceased when she shot him, but merely intended to hurt him so as to make him leave. The second point made is that the shooting was the impulse of the moment and lacked

the element of deliberation required in murder of the first degree.

This court, in a recent opinion, *Bantum v. State*, 7 *Terry* 487, 85 *A.* 2d 741, restated the elements of murder in the first degree, defined by *Section* 5157, *R. C.* 1935, as killing done "with express malice aforethought". From that case it appears that express malice, as that term is used in the definition of murder in the first degree, simply means the killing of another with a sedate, deliberate mind and formed design. The formed design consists of an intention to kill, or of an intention to do great bodily harm. The mere use of a deadly weapon, in the absence of circumstances showing the contrary, raises a presumption that the user knows the probable consequences of his act, among which may be death. Since the defendant admittedly used a deadly weapon upon the deceased with the intention of hurting him in order to make him leave, she, at the time of the shooting, possessed a formed design to do him great bodily harm. The defendant argues that the intention to shoot another in the arm only is not an intention to do great bodily harm, but we are unable to accept so artificial a conception. The facts clearly show that the defendant intended to shoot the deceased, and this fact would have supported a conclusion of the jury that this was a killing done with intent to kill or to do great bodily harm. Malice is, of. course, implied from the use of a deadly weapon without sufficient cause or provocation, and the evidence warranted the finding by the jury that no circumstances of provocation existed to rebut the inference of malice.

In addition to the presence of malice, the crime of murder in the first degree requires that the perpetrator be acting with a sedate and deliberate mind which results in the intention to kill or do great bodily harm. The defendant argues that no such deliberation was present in this case. However, the events which led up to the threat of the defendant to shoot the deceased and his dare to her to do it, the passage of time required for the defendant to walk across the room, pick up the rifle, aim and

shoot it, would have supported a conclusion by the jury that the defendant had an opportunity sedately and deliberately to make up her mind to inflict great bodily harm. The facts were not compelling in that respect, but they were not entirely lacking.

The issue of degree of guilt upon the evidence was one for the jury to determine. The resolving of factual inferences determined the issue. We think the evidence required that this be done, for the question of degree of guilt in this case was a close one. The trial court, therefore, was required to submit the issue to the jury.

■ The defendant points to an alleged prejudicial statement of fact made by the Deputy Attorney General in his summation to the jury, resulting in a comment from the bench, which, in one view, might be taken as an expression of opinion upon the evidence, and to questions asked of the defendant in cross-examination over objection which were phrased so as to elicit an admission by her that she shot the deceased "deliberately", as reversible error. All of these matters, however, relate to the issue of murder in the first degree of which the defendant has been acquitted. In such case, the acquittal cures the errors if, indeed, they were errors. 3 *Am. Jur., Appeal and Error,* § 1110, *p.* 633; *State v. Moynihan*, 93 *N. J. L.* 253, 106 *A.* 817; *Commonwealth v. Santos*, 275 *Pa.* 515, 119 *A.* 596.

■■ Finally, the defendant argues that the verdict of the jury actually returned was a nullity. This argument is based upon the fact that there is no statute of this state authorizing a jury to recommend to the mercy of the court after a verdict of guilty, except for *Section* 5330, *R. C.* 1935, which authorizes the jury to recommend mercy at the same time it returns a verdict of guilty of a crime punishable by death. It is argued that since the punishment of life imprisonment is mandatory upon a verdict of guilty of murder in the second degree, the fact that the jury at the same time recommended mercy indicates that the verdict was returned with the erroneous belief that such a recommendation would lessen the severity of the punishment to

be imposed, and that if the jury had realized that such was not the effect, the verdict would have been guilty of manslaughter.

The argument thus made asks us to assume that the verdict was a compromise one, and to further assume that had the inefficacy of the recommendation been pointed out to the jury, the probability is that a verdict of guilty of manslaughter would have been agreed upon. We do not think such an assumption can be made. To impute to the members of the jury the desire to compromise the degree of guilt of the defendant would be to assume that they were blind to their obligation taken under oath to return a verdict in accordance with the evidence. This we would not be justified in doing upon the strength of an ineffectual recommendation of mercy alone. It is a practice of long standing in the criminal courts of this state to accept verdicts of guilty in all types of crimes together with a recommendation of mercy by the jury, even though, as we have pointed out, there is no statutory authority for such procedure except in capital cases. We can see no objection to the practice. The recommendation may be ineffectual to reduce the sentence, as in this case, but it would almost certainly receive earnest consideration in the event application were to be made for executive clemency.

The argument made by the defendant in this respect has received the attention of many courts in other states. With few exceptions, those courts are agreed that a verdict of guilty accompanied by an unauthorized recommendation of mercy is nonetheless valid. See annotations 17 *A. L. R.* 1161; 87 *A. L. R.* 1372; and 138 *A. L. R.* 1250.

The conviction of the defendant is affirmed.