William M. HALLOWELL, Petitioner,

v.

Paul W. KEVE, Director of the Division of Adult Corrections and the State of Delaware, Respondents.

Civ. A. No. 75–339.

United States District Court, D. Delaware.

April 22, 1976.

relief if the procedures to be used are further clarified.

L. Vincent Ramunno, Wilmington, Del., for petitioner.

Francis A. Reardon, Deputy Atty. Gen., and George H. Seitz, III, State Prosecutor, Wilmington, Del., for respondents.

## OPINION

STAPLETON, District Judge:

In this habeas corpus proceeding, petitioner attacks his state court conviction for second degree murder. First, he maintains that the trial judge deprived him of his rights to trial by jury and due process of law by refusing to charge the jury regarding involuntary manslaughter. Second, petitioner asserts that the court's charge relieved the State of its constitutional duty under *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) to prove an absence of provocation and passion beyond a reasonable doubt.[1]

### I. THE EVIDENCE AT TRIAL.

The facts necessary to a resolution of the issues currently before this Court can be briefly stated.

In the late afternoon of Sunday, October 3, 1971, petitioner and his wife returned

---

1. Originally, petitioner's claim of unconstitutional confinement was premised on three additional grounds, but I have heretofore refused to pass upon those claims because of petitioner's failure to exhaust state remedies. Order of November 4, 1975, Doc. No. 10.

home from an American Legion Hall where they had spent approximately three hours. An argument developed. Fern Hallowell cursed her husband. He asked her to stop. She cursed him again and he slapped her. She left their mobile home and went next door, approximately five feet away, to the mobile home of her daughter and son-in-law, Carol and Fred Ellingsworth.

Shortly thereafter, petitioner went to the Ellingsworth home in order to get his wife to come home. When he arrived, he found not only the Ellingsworths but also Ronald Charest, Mrs. Hallowell's first husband. Charest told petitioner to leave and said something to the effect that any man who would strike a woman was no man at all. This statement, the fact that his wife was discussing personal problems outside the home, and a belief that Charest was interfering where he had no business doing so, angered petitioner. He returned the few steps to his home and took a knife from a drawer. He testified: "I just wanted to bluff him and back him down." Petitioner soon thought better of the idea, however, and laid the knife down on a room divider inside his trailer. He then went back to the Ellingsworth mobile home to get his wife and wound up challenging Charest to a fight.

From this point on the testimony of the eyewitnesses differed to some degree. Petitioner testified that when he arrived unarmed at the Ellingsworths and offered to fight Charest, Charest approached and kicked him several times. This precipitated blows between the two of them and ultimately the throwing by Charest of two articles of furnishings. The last of these was a stool which missed petitioner when he ducked and broke the storm door glass on the Hallowell trailer. Petitioner's account continued:

> And that is when I dashed in and grabbed the knife on the room divider and was going to back him down to pull a bluff. And as I made a swipe, it was not at full arm's length, I just went like that (indicating) so as to make him back down

more, or scare him more, and he seemed to take a step forward, with his arms up like this (indicating), and after I realized what happened I just stood there. I wanted to say I was sorry, but I couldn't say nothing.

\* \* \* \* \* \*

Q  Let's go back to when you got the knife. What was the purpose of getting the knife in the first place?

A  Just to pull a bluff, to scare him. I had no intention of contact whatsoever.

Q  What was your primary purpose of going to the house originally?

A  I wanted to get my wife to come back.

On cross-examination petitioner specifically acknowledged that he had made a "swipe" with the knife in the direction of Charest when they were only a step apart:

Q  I think on direct examination you did say you did swipe the knife towards him, is that right?

A  I just went like that (indicating), yes.

Q  That was part of the bluff, making a lunge towards the other man with an 8-inch knife?

A  I did not lunge.

Q  Whatever movement it was?

A  That is right.

Q  Did he leap onto the knife. Is that how he got stabbed.

A  He sort of raised his arm and made a step forward with his right foot.

Q  One step. That knife must have been pretty close to him if that one step forward got the knife into him far enough to kill him.

A  I had no idea I was that close to him. I had no intention of being that close to him.

In his testimony, petitioner expressly denied being intoxicated and nothing else in the record suggests that petitioner's ability to perceive what was going on was in any way impaired.

Carol and Fred Ellingsworth each testified that there had been no physical contact

between petitioner and Charest prior to the time petitioner appeared with a knife and that Charest had thrown nothing until after he had been stabbed.

In this factual setting, the trial judge agreed to charge the jury on voluntary manslaughter, but declined a defense request to charge on involuntary manslaughter.

Petitioner was sentenced to life imprisonment.

## II. THE FAILURE TO CHARGE ON INVOLUNTARY MANSLAUGHTER.

On appeal to the Supreme Court of Delaware, petitioner argued that, given his testimony that he had no intention of hurting the victim, the conviction might have been for involuntary manslaughter if the jury had been instructed regarding that crime. Petitioner adds that the trial judge not only erred in failing to give such an instruction but made matters worse by expressly telling the jury that this was not a case of involuntary manslaughter. This advice effectively removed from jury consideration what petitioner maintains was his primary defense—i. e., that he had no subjective intention of killing or injuring Charest.

The Supreme Court of Delaware held that under Delaware law involuntary manslaughter is the unintentional "killing of another without malice while engaged in the doing of an unlawful act, *not in itself felonious or tending to do great bodily harm*." (emphasis in original) Del., 298 A.2d 330, 332 (1972). Noting that in petitioner's own version of the facts, his intentional "act clearly was one which tended to do great bodily harm," the court held that the trial judge did not err in failing to permit the jury to consider involuntary

manslaughter. The court went on to explain that the malice required to convict a defendant of second degree murder is "rebuttably presumed" from an act "which tends to do great bodily harm." Although it could be argued that the possible rebuttal referred to by the court relates to evidence tending to show absence of a subjective intent to kill or seriously injure, it seems clear from the context that the court referred instead to evidence of justification (legal authorization), excuse (self-defense), or mitigation (heat of passion). Thus, the Delaware Supreme Court in petitioner's case interpreted Delaware law as holding that subjective intent to kill or seriously injure is not a necessary element of the crime of second degree murder.[2]

In the absence of extraordinary circumstances not here present,[3] the highest court of a State is the final arbiter of questions regarding the law of its state. *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Since under Delaware law as interpreted by the highest court of the State, the intentional doing of an act tending to do great bodily harm is inconsistent with a finding of involuntary manslaughter, there was no need to charge the jury on that offense. The Constitution does not require a judge to charge on an issue which is not fairly presented by the evidence in the case. *Pavkovich v. Brierley*, 360 F.Supp. 275 (W.D.Pa.1973), aff'd. 493 F.2d 1401 (3rd Cir. 1974); *Kregger v. Bannan*, 170 F.Supp. 845 (E.D.Mich.1959), aff'd. 273 F.2d 813 (6th Cir. 1960). It follows that petitioner's conviction must stand unless it can be said that these substantive rules of Delaware law somehow violate substantive due process. Petitioner cites no authority

---

2. There are earlier Delaware cases which support this view of Delaware law. *E. g., Ruffin v. State*, 11 Terry 83, 50 Del. 83, 123 A.2d 461 (Del.Sup.Ct.1956); *Powell v. State*, 7 Terry 551, 46 Del. 551, 86 A.2d 371 (Del.Sup.Ct.1952); *Bantam v. State*, 7 Terry 487, 46 Del. 487, 85 A.2d 741, 751 n. 2 (Del.Sup.Ct.1952).

3. On rare occasions, federal courts are permitted to reexamine a state court's interpretation of its own law when it appears to be an "obvious subterfuge to evade consideration of a federal issue." *Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120, 129, 65 S.Ct. 1475, 1480, 89 L.Ed. 2092, 2100 (1945). This is not such a case.

in support of his argument that they do and I perceive no basis for so concluding.[4]

### III. MULLANEY v. WILBUR.

Four principal questions are presented for decision:

1. Should this Court decline to entertain the *Mullaney*-based challenge because petitioner has not squarely presented that issue to the Supreme Court of Delaware?

2. Should the *Mullaney* decision be applied retroactively to petitioner's case?

3. If applicable, does *Mullaney* dictate that petitioner's conviction is constitutionally infirm?

4. Assuming *Mullaney* is applicable and renders petitioner's conviction infirm, what remedy should be afforded petitioner?

Because of the conclusions which I reach, I need address only the first and third of these questions.

#### A. *Exhaustion Of State Remedies.*

Respondent suggests, at the outset, that this Court should decline to consider petitioner's attack based on *Mullaney v. Wilbur* because the Supreme Court of Delaware concededly has not considered the applicability of the rule of that case in the specific context of petitioner's case.

■ Time and time again this Court has held that considerations of comity require dismissal of habeas corpus petitions when the petitioner has failed to avail himself of his state remedies. The exhaustion doctrine, however, precludes federal review only when a petitioner's state remedy is both "adequate and available". 28 U.S.C. § 2254; *Preiser v. Rodriguez,* 411 U.S. 475, 493, 93 S.Ct. 1827, 1838, 36 L.Ed.2d 439, 452 (1973). Accordingly, where it is clear from existing decisions of a State Supreme Court that pursuit of a state remedy would be futile, exhaustion is not required. *Mott v. Dail,* 337 F.Supp. 731 (E.D.N.C.1972).

■ In *Fuentes v. State,* Del., 349 A.2d 1 (1975), the Supreme Court of Delaware held that the *Mullaney* case rendered unconstitutional a Delaware statute relating to homicide under "extreme emotional distress",[5] but expressly declined to apply the rule of that case retroactively. Since the petitioner in this case was tried and his appeal denied before the *Mullaney* and *Fuentes*[6] decisions were rendered, it is clear that any Delaware post-conviction relief proceeding could not result in petitioner's securing relief. Accordingly, he has exhausted his "adequate" state remedies.

#### B. *Mullaney And The Charge In Petitioner's Case.*

In *Mullaney,* the Supreme Court considered the homicide law of Maine. Juries in Maine homicide cases were told that there were two degrees of the offense of

---

**4.** Most states define murder to include more than homicides involving a subjective intention to kill or seriously injure. In addition to so-called "felony murders", some form of homicide involving reckless disregard of human life is usually included within the category of murder. In some states, this type of homicide requires more than an intent to do an act which holds an unreasonable danger to human life; it requires a state of mind in which the defendant consciously perceives the danger of his act and concludes that he doesn't care. See *United States v. Dixon,* 135 U.S.App.D.C. 401, 419 F.2d 288 (1969) (Leventhal, J. concurring); Wechsler and Michael, *A Rationale of the Law of Homicide,* 37 Col.L.Rev. 701, 709–13 (1937). Other states do not require that the defendant subjectively appreciate the risk. *Commonwealth v. Pierce,* 138 Mass. 165, 178 (1884) (Holmes, J.). A possible, although on the facts

of this case not a necessary, reading of the opinion of the Supreme Court is that Delaware follows the Holmesian approach. But I do not believe the Constitution mandates either approach. The important thing for present purposes is that the law of murder has traditionally imposed responsibility for inherently dangerous acts done with less than a subjective intention to kill or inflict serious bodily injury, and it has never been suggested that due process of law is offended by that practice.

**5.** This statutory law was recognized by the court as being "a substitute for our prior common law defense of 'provocation'." 349 A.2d at 5.

**6.** The *Fuentes* court held that its ruling would apply only to cases eligible for direct appeal on September 29, 1975, the date of *its* decision in the *Fuentes* case.

voluntary homicide, murder and voluntary manslaughter.[7] The common element in both degrees of homicide was an intentional and unlawful killing,[8] the distinguishing factor between the two degrees being the presence or absence of malice.[9] This latter element would be conclusively implied, juries were told, from proof beyond a reasonable doubt that an intentional[10] and unlawful[11] killing had occurred, unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion upon sudden provocation.[12] The effect of the defendant's successfully shouldering this burden was to reduce what would otherwise be a murder verdict to a manslaughter verdict.

In *Mullaney* the Supreme Court found this practice of requiring the defendant to prove heat of passion upon provocation constitutionally offensive since it could not be reconciled with the rationale of *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375 (1970). *Winship* held that the prosecution must prove beyond a reasonable doubt every fact necessary to constitute the crime charged.[13] While the *Mullaney* court accepted Maine's own interpretation of her homicide statute as not making the absence of passion an element of the crime of murder, it nevertheless held that the burden of persuasion on this issue could not constitutionally be placed on the accused. The Maine practice, the Supreme Court noted, could result in a jury finding

that a defendant was guilty of murder when the evidence showed that it was as likely as not that he was only guilty of manslaughter.[14] Such a result, the Supreme Court ruled, compromised the two values sought to be protected by *Winship* —avoidance of significant deprivations of the defendant's liberty on less than a beyond a reasonable doubt showing and the public interest in the reliability of jury verdicts.[15]

■ Given this rationale. it is difficult to read *Mullaney* narrowly.[16] Rather, *Mullaney* would appear to stand for the general proposition that the Due Process Clause is offended whenever the State is relieved of the duty of proving a "critical fact in dispute"[17] in a homicide prosecution beyond a reasonable doubt. A "critical fact in dispute" in this context means any fact fairly put at issue by the evidence the presence or absence of which would have substantial impact upon the defendant's liberty interest and the determination of which on less than a reasonable doubt standard would substantially increase the likelihood of an erroneous murder conviction. With this understanding of the teachings of *Mullaney,* I turn to the facts of petitioner's case and the charge there given.

I agree with petitioner's trial judge that the evidence fairly placed at issue the question of whether the fatal wound was inflicted in a heat of passion occasioned by provocation.[18] Moreover, I believe it clear that,

7. 421 U.S. at 685, 95 S.Ct. at 1883, 44 L.Ed.2d at 511–512.

8. *Id.*

9. 421 U.S. at 686, 95 S.Ct. at 1883, 44 L.Ed.2d at 512.

10. Meaning that the accused acted with the intent to kill or inflict serious bodily injury or with reckless indifference to human life.

11. Meaning that the accused was not legally authorized to kill and did not act in self defense.

12. 421 U.S. at 686, 95 S.Ct. at 1883, 44 L.Ed.2d at 512.

13. 421 U.S. at 704, 95 S.Ct. at 1892, 44 L.Ed.2d at 522–523.

14. 421 U.S. at 701, 703, 95 S.Ct. at 1891, 1892, 44 L.Ed.2d at 521, 522.

15. 421 U.S. at 699–701, 95 S.Ct. at 1889–1891, 44 L.Ed. at 520–521.

16. See *Evans v. State,* 28 Md.App. 640, 349 A.2d 300, 346 (Ct.Spec.App.Md.1975) for a thorough and thoughtful analysis of the impact of *Mullaney* on the Maryland law of homicide.

17. 421 U.S. at 701, 95 S.Ct. at 1890, 44 L.Ed.2d at 520.

18. See e. g., *State v. Adams,* 6 Pennewill 178, 6 Del. 178, 65 A. 510, 512 (Del.Ct. O & T 1906) (where defendant has killed in mutual combat and there is evidence from which jury might find defendant acted "in a transport of passion, . . . upon sufficient provocation, . . . and without time for the passions to cool",

given the Delaware law of homicide as it existed at the time of petitioner's offense, the presence of heat of passion upon provocation is a "critical fact" in *Mullaney* terms. Heat of passion, under the relevant Delaware law, was the primary, if not the sole, distinguishing factor between second degree murder and voluntary homicide and the maximum penalties for those offenses differed substantially.[19] The Supreme Court of Delaware, by necessary implication, recognized heat of passion as a "critical fact" in *Fuentes v. State*. Accordingly, the crucial question is whether the trial judge's charge placed the burden on the State of persuading the jury of the absence of heat of passion beyond a reasonable doubt. If the charge can fairly be interpreted as placing any burden of persuasion regarding this issue upon the defendant or if the charge, fairly read, relieved the State of its burden on this issue by presumption or otherwise, the conviction for second degree murder cannot stand.

█ I agree with respondent that, in applying the teachings of *Mullaney*, one must look to the charge as a whole and the overall message that it conveyed to the jury.[20] For this reason it is necessary that I quote rather extensively from the trial judge's instructions:

"The defendant . . . contends he is not guilty of any offense, and by his plea of not guilty he has directly placed in issue every essential element of the State's case against him. Each essential element must be proved by the State beyond a reasonable doubt.

\* \* \*

Homicide is the killing of one human being by another. Felonious or wrongful homicide is divided into three classes: Murder in the first degree, murder in the second degree, and manslaughter. To constitute murder either of the first or second degree the element of malice must be present. Without malice there can be no murder, and with malice there can be no manslaughter.

Malice is the great test or criterion of murder. It is not easy to explain clearly what is meant in law by malice. In common acceptance the term means hatred, spite, or ill will against a person, but in its legal sense, the sense in which it is used with respect to the crime of murder, malice is more comprehensive than mere personal hatred, spite or ill will by one person against another. While malice includes these things, it also comprehends and includes all acts done from an unlawful and wrongful motive.

To put it another way: Malice includes all acts done voluntarily and with a willful disregard for the rights and safety of others.

Malice, therefore, is a condition of mind or heart existing at the commission of the fatal act. It includes that general reckless disregard of human life which proceeds from a heart and mind void of a just sense of social duty and fatally bent on mischief.

\* \* \*

Implied or constructive malice may be shown by the character of the fatal attack and the surrounding circumstances under which the attack occurred. When the fatal attack was unlawful and cruel, and voluntarily committed, when it was committed without adequate provocation and in circumstances which show a wicked indifference to human life or with a reckless disregard of the consequences, in those situations the law implies or infers malice.

In a case of murder in the second degree, therefore, it is not required that the State prove the killing was done with express malice, as is required in murder in the first degree, but the State must prove that the killing was done with implied or construc-

---

defendant is entitled to a voluntary manslaughter charge).

**19.** At the time of petitioner's offense, the maximum penalty for second degree murder was

imprisonment for life; the maximum for voluntary manslaughter was imprisonment for thirty years.

**20.** *U. S. ex rel. Castro v. Regan,* 525 F.2d 1157 (3rd Cir. 1975).

tive malice, that is, where the malice is inferred or inferable from facts which are actually proved. Malice is implied by law from every intentional cruel act committed by one person against another, however sudden the act may be. The law considers that he who commits a cruel act voluntarily, does it maliciously.

Every person in law is presumed to contemplate the natural and the ordinary consequences of his own voluntary act, and if the act voluntarily and willfully done has a direct tendency to destroy the life of another, then the natural conclusion from that fact is that the destruction of the person's life was intended by the person who committed the act. For example, the intentional use of a deadly weapon upon the body of another without sufficient cause or provocation is sufficient to warrant the inference of malice.

Members of the jury, the weapon used in this case is certainly a deadly weapon when improperly used, certainly when it is carelessly used.

Murder in the second degree, therefore, occurs when a killing is done without justification or excuse and without adequate provocation, and when it is done with a wicked and depraved heart or with a cruel and wicked indifference to human life. *In a case of that kind the law implies malice and renders it incumbent upon the accused to show by evidence that the killing was not done maliciously, or in fact that there were circumstances of mitigation, extenuation, justification, or excuse.**

I now turn from murder in the second degree to manslaughter. . . . There are two kinds of manslaughter, voluntary and involuntary. We are only concerned with voluntary in this case.

Voluntary manslaughter occurs when one unlawfully kills another without malice in his mind or heart. The absence of malice is the feature which distinguishes manslaughter from murder. For example, where one in a sudden fight, in the heat of blood or in a gust or transport of passion without time

for reflection or for the passions to cool, kills another, such a killing amounts to voluntary manslaughter. This is because the law makes allowance for human frailty or infirmity under great and sudden provocation. But in order to reduce the crime from murder to voluntary manslaughter where a dangerous or deadly weapon is used the provocation must be great. It must be so great as to produce such an actual frenzy of the mind as to render the accused for the time being utterly deaf to the voice of reason.

Mere words, no matter how insulting or offensive, do not amount to a provocation sufficient in law to reduce the crime to manslaughter. Provocation as meant in law must be something which the slayer feels at the instant of the fatal act, and he must act under the sting of that provocation and resent it at once without delay or time for thought or reflection. If between the provocation and the fatal act there is time for thought or reflection, or for passion to subside and blood to cool, the provocation will not avail. Therefore, while murder proceeds from a wicked and depraved spirit and is characterized by malice, voluntary manslaughter results not from malice but from unpremeditated and from unreflecting passion.

\* \* \*

Now, to summarize, if you find beyond a reasonable doubt that the defendant killed Ronald Joseph Charest and that killing was done with malice, then you should find the defendant guilty of murder in the second degree.

If you do not find beyond a reasonable doubt that the killing was done with malice, but do find beyond a reasonable doubt that the defendant killed Ronald Joseph Charest under such circumstances as to amount to voluntary manslaughter, as I have defined that crime to you, then you should find the defendant guilty of voluntary manslaughter.

Also, if you do not find the defendant beyond a reasonable doubt guilty of murder

---

\* Emphasis supplied.

in the second degree, and also do not find the defendant guilty of manslaughter, beyond a reasonable doubt, then you may determine whether or not you find beyond a reasonable doubt the defendant is guilty of an assault only, if the evidence so warrants such a verdict.

\* \* \*

This defendant, like every person brought to trial in a criminal proceeding in this State, is presumed to be innocent until his guilt is established to the satisfaction of the jury beyond a reasonable doubt. The burden of proving the commission of the offense rests upon the State. If after carefully considering the evidence you have a reasonable doubt of the defendant's guilt, you should give him the benefit of such doubt, but proof beyond a reasonable doubt does not mean that the guilt of the accused must be established to an absolute certainty. Such a requirement would be impracticable and unreasonable. Reasonable doubt does not mean a vague, speculative doubt, nor a mere possible doubt, but a substantial doubt. It is such a doubt as intelligent, reasonable and impartial men and women honestly entertain after a careful and conscientious consideration of all the evidence in the case.

Now, of course, members of the jury, if you are not satisfied beyond a reasonable doubt that the defendant is guilty of any one of these charges about which I have instructed you, or if you entertain a reasonable doubt as to the guilt of the defendant as to any one of those charges, you, of course, should give the defendant the benefit of the doubt and return a verdict of not guilty. In any event, your verdict should be unanimous."

The respondent concedes that the charge was not a model of clarity. He correctly points out, however, that the question is not whether the jury could have been more clearly instructed, or even whether the charge accurately reflects Delaware law. Rather, the issue is whether the charge taken as a whole placed on the State the burden of proving an absence of heat of passion beyond a reasonable doubt.

Petitioner relies primarily upon the italicized language, contending that it placed upon him the burden of persuading the jury that he acted in the heat of a passion occasioned by provocation. Respondent counters that the paragraph which contains the italicized language, when literally read in its entirety, is an accurate statement of principles of Delaware law which are wholly consistent with *Mullaney* and that, in any event, the remainder of the charge clearly put the burden of persuasion where it constitutionally must rest.

The challenged paragraph can be taken as a statement (1) that second degree murder is the killing of another with a depraved heart or "wicked indifference" and without justification, excuse or adequate provocation and (2) that when the State's case shows no mitigation by way of provocation, the defendant must come forward with some evidence which will put provocation and heat of passion fairly in issue.[21] If the challenged paragraph is so read, it does not take the burden of persuasion from the State's shoulders and is entirely consistent with the teachings of *Mullaney*.[22] I cannot, however, accept the proposition that this is the message which this paragraph would convey to a jury with no understanding of the distinction between the burden of per-

---

**21.** While it is not relevant to the legal question currently before me, there is reason to believe the trial judge may not have been trying to convey the second thought. Petitioner had come up with evidence creating a genuine heat of passion issue and there was no need to instruct the jury on the burden of going forward. Moreover, the Delaware law at the time seems to have placed the burden of persuasion on the accused on this issue. *Quillen v. State*, 10 Terry 114, 10 Del. 114, 110 A.2d 445 (Del. Sup.Ct.1955).

**22.** *Mullaney* expressly approved a rule placing the burden of going forward with evidence on the accused, so long as the burden of persuasion remains with the State. 421 U.S. at 701–02 n. 28, 95 S.Ct. at 1891, 44 L.Ed.2d at 521–522.

suasion and the burden of going forward with evidence. In the absence of clear instructions to the contrary, I believe there would be a substantial risk of a juror taking this portion of the instruction to mean that the accused had the burden of proving heat of passion.

It does not follow, however, that the writ should issue. Despite its lack of clarity in some respects, the charge as a whole clearly conveyed two propositions to the jury:

1. Malice and heat of passion, as those concepts were being utilized by the court, are mutually exclusive, and

2. Malice is an essential element of second degree murder which the State must prove beyond a reasonable doubt.

The trial judge twice instructed the jury to the effect that "without malice there can be no murder, and with malice there can be no manslaughter". On two occasions he defined malice as excluding the case of "adequate provocation". Finally, and most importantly, in the crucial portion of the charge which distinguished between second degree murder and voluntary manslaughter, the trial judge contrasted a malicious killing which is the product of a "depraved heart" or a "cruel indifference to human life" with a killing which is the product of "an actual frenzy of the mind" which renders the accused "utterly deaf to the voice of reason". This contrast was reemphasized by an instruction that "while murder proceeds from a wicked and depraved spirit and is characterized by malice, voluntary manslaughter results, not from malice, but from unpremeditated and from unreflecting passion".

Thus, the court made it clear to the jury that in order to find malice they had to find a state of mind free from passion generated by provocation. Because this point as well as the State's burden to prove malice beyond a reasonable doubt were driven home to the members of the jury, they must have realized that they could not bring back a verdict of second degree murder unless they were satisfied beyond a reasonable doubt that petitioner did not act in a fit of passion engendered by the provocation for his victim. The testimony of the Ellingsworths' clearly supported such a view and it seems apparent that the jury accepted their version of the facts. On this record, one can conclude with confidence that the jury was convinced this was not a case of killing in the heat of passion. Accordingly, the interests sought to be protected by *Mullaney* were not jeopardized.

This case presents a situation not unlike that before the Supreme Court of the United States in *Cupp v. Naughton,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). At the close of an armed robbery trial during which the defendant did not testify, an Oregon trial court charged the jury that "every witness is presumed to speak the truth." Until this presumption is overcome in the jury's mind by their observations of the witness, by evidence of his bias or interest, "by contradictory evidence, or by presumption." 414 U.S. at 150, 94 S.Ct. at 402, 38 L.Ed.2d at 375. The court disapproved of this instruction but found no constitutional infirmity. The court reasoned:

> In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Boyd v. United States,* 271 U.S. 104, 107, 46 S.Ct. 442, 70 L.Ed. 857 (1926).

> \* \* \*

The Court of Appeals in this case stated that the effect of the instruction was to place the burden on respondent to prove his innocence. But the trial court gave, not once but twice, explicit instructions affirming the presumption of innocence and declaring the obligation of the State to prove guilt beyond a reasonable doubt. The Court of Appeals, recognizing that these other instructions had been given, nevertheless declared that "there was no instruction so specifically directed to that under attack as can be said to have effected a cure." 476 F.2d, at 847. But we believe this analysis puts the cart before the horse; the question is not

whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.

\* \* \*

The jury here was charged fully and explicitly about the presumption of innocence and the State's duty to prove guilt beyond a reasonable doubt. Whatever tangential undercutting of these clearly stated propositions may, as a theoretical matter, have resulted from the giving of the instruction on the presumption of truthfulness is not of constitutional dimension. The giving of that instruction, whether judged in terms of the reasonable-doubt requirement in In re Winship, supra, or of offense against "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934), did not render the conviction constitutionally invalid.\*

The petition for a writ of habeas corpus will be denied.

---

\* To the same effect, *U. S. ex rel. Castro v. Regan,* 525 F.2d 1157 (3rd Cir. 1975).