COMMONWEALTH *vs.* RAYMOND S. PETERS.

Barnstable.    January 3, 1977. — April 5, 1977.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

*Jury and Jurors.   Homicide.   Practice, Criminal,* Continuance, Charge
   to jury.

At a hearing on a motion to quash a jury venire, evidence offered by
   the defendant did not support his claim that its composition was un-
   constitutional [321-323]; in the absence of even minimal substantia-
   tion of the defendant's claim, the judge did not abuse his discretion in
   refusing to grant a continuance to enable the defendant to establish
   the grounds claimed in his motion [323-324].
At the trial of an indictment charging murder in the first degree, the
   judge did not err in his instructions to the jury with respect to man-
   slaughter. [324-325]

INDICTMENTS found and returned in the Superior Court
on March 20, 1975.

The cases were tried before *McLaughlin,* C.J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

*Donald H. Barnes* for the defendant.

*Philip A. Rollins,* District Attorney (*Gary A. Nicker-
son,* Assistant District Attorney, with him) for the Com-
monwealth.

KAPLAN, J.    The defendant appeals pursuant to G. L.
c. 278, §§ 33A-33G, from judgments of conviction entered
on verdicts of guilty of murder in the second degree (the
indictment having charged murder in the first degree),
assault with intent to murder, and assault by means of a
dangerous weapon. Two points are argued: (1) that the
trial judge erred in denying a defense motion to quash
the jury venire on grounds of its unconstitutional com-
position (or to extend time to enable counsel to establish

the claimed grounds); (2) that the judge erred in an instruction to the jury with respect to manslaughter (to which, however, no objection or exception was taken).

We reconstruct the facts as they could appear to the triers. In early afternoon of February 10, 1975, a car driven by Lawrence Hendricks, III, with the defendant (his cousin) and Robert Lopes as passengers, pulled up at the driveway of a house in Mashpee. In or near the driveway were John Amado (the murder victim), Catherine Sullivan (the assault victim), David Bonito, and two young children. Lopes approached Amado and talked with him about buying from Lopes a tape player or "deck." The defendant came over. After a brief conversation between the defendant and Amado (the content was unproved), the two fell to fighting with their fists, with some evidence that the defendant struck the first blow. During the encounter the defendant said he was going to get Amado for what happened to his (the defendant's) brother at a party in New York where the brother had taken an overdose of drugs.

After the men disengaged (possibly in response to words from Hendricks), the defendant went to the passenger side of the car. He was then seen to be holding a holster and a gun, evidently taken from the car. Amado had walked to the driver's side of the car where he spoke to Hendricks who was still in the driver's seat. Amado apparently saw the defendant armed. He crouched down alongside the car. The defendant put his foot in the well of the car and boosted himself to the roof. Amado said, "Let's talk this over," but the defendant said, "[T]here's nothing to talk over . . . ." Firing over the roof or while clambering down on the driver's side, the defendant struck Amado in the mid left thigh, inflicting a flesh wound. Amado began to exclaim and swear. The defendant fired at least two more shots, one striking Amado in the rear of the head, another entering his mouth. He died instantly.

Crossing to the entrance of the house, where Miss Sullivan was standing, the defendant said, "We have to get rid of you because we don't want you to fink to the pigs."

He struck her in the head four times with the revolver in his hand and then shot her in the face, blinding her right eye.

Hendricks meanwhile had started up the car. The defendant pointed the gun at Hendricks and warned him not to leave. The defendant boarded the back of the car. Lopes had seated himself in the front. Hendricks drove off. Hendricks asked the defendant why he had done it. The defendant said it was because of his brother, something had happened in New York with his brother, they killed his brother in New York.

As to the defendant's criminal responsibility or the extent of it, the only issues that could be raised with any show of plausibility were self-defense, "transport of passion," and the influence of alcohol or drugs. On the latter point, the defense in cross-examining Hendricks elicited testimony that the defendant had been drinking and taking drugs that morning, and that on the drive ending at the scene all in the car had drunk wine and smoked marihuana. There was testimony of a police officer called by the defense that Miss Sullivan, at the hospital, had said the defendant was shooting wild, into the trees and everything, but the officer also testified that Miss Sullivan was under sedation and incoherent at the time, and she denied from the stand that she had made such a statement.

1. On the morning of the day set for trial, November 17, 1975, the defendant made several motions addressed to the details of the trial. He also moved to quash the venire on the stated grounds that "the jury ... [did] not adequately represent: 1. Persons under the age of twenty-five in the county. 2. Persons of minority racial and cultural classification in the county. 3. Wage earners as opposed to proprietors in the county. 4. Unemployed persons within the county." He further moved in effect for a continuance to gather additional evidence on the subject.

Although we need not rest on the proposition, the motion may well have been insufficient on its face as failing to disclose a cognizable basis for challenging the venire. Underrepresentation of the age group has been held not

to be such a basis. See *Commonwealth* v. *Lussier,* 364 Mass. 414, 423-424 (1973); *Commonwealth* v. *Therrien,* 359 Mass. 500, 507 (1971). The reference to race and culture was amorphous and lacked even moderate clarity: there was no statement of the minority or minorities intended and, while the record characterizes the defendant (and the murder victim as well) as "black," counsel resisted saying in argument in our court that he was pointing to the black minority (or limiting himself to it), and he did not commit himself as to any other minority. Cf. *Hernandez* v. *Texas,* 347 U.S. 475, 478-480 (1954). As to the economic classes, it seems the Supreme Court of the United States has not yet held that underrepresentation of a class defined in those terms is a constitutional vice in jury selection (see *Fay* v. *New York,* 332 U.S. 261, 291-293 [1947]; but see *Labat* v. *Bennett,* 365 F.2d 698, 720-727 [5th Cir. 1966], cert. denied, 386 U.S. 991 [1967]),[1] although in regulating Federal juries the Court would quash venires from which "common laborers" were systematically excluded. See *Thiel* v. *Southern Pac. Co.,* 328 U.S. 217, 225 (1946). If, however, the ultimate touchstone of constitutionality is whether the system as a whole and in a general sense is or is not calculated to produce as triers a fair cross-section of the populace (see *Taylor* v. *Louisiana,* 419 U.S. 522, 530 [1975]), a motion like the present may get by as a statement of claim.

The pleading was not important except as an index to the substance, and here the defendant failed conspicuously. The proof he tendered consisted, first, of the list of seventy-eight persons making up the venire. From the list with short catchphrases about the individuals, one could not draw reliable inferences about the composition of the venire for the present purpose. The prosecutor volunteered that he knew one person to be a "black Indian."[2] In his brief, the defendant now says two were minority persons,

---

[1] Compare *Commonwealth* v. *Stone,* 366 Mass. 506, 509-510 (1974) (on the question of exclusion of "paupers").

[2] As it happened this person was related to one of the witnesses.

but he leaves it at that. No evidence was offered as to the composition of any past venire. The only other evidence offered was a paper put out by the Cape Cod Planning and Economic Development Commission in 1975, evidently based largely on 1970 census figures, which provided some rudimentary information about Barnstable County. It indicated that the "Negro" component of the population was 2.2%, and "other" nonwhite 1.1% (2 out of 78 is 2.56%). The economic information was quite fragmentary. It is plain, then, that all the evidence taken together not only did not establish purposeful, systematic exclusion of any group from juries;[3] it did not come near making a prima facie case calling on the Commonwealth to furnish an explanation. See *Castaneda* v. *Partida,* 430 U.S. 482, 499-500 (1977); *Hernandez* v. *Texas, supra* at 479-482.

Counsel for the defendant asked for a chance to improve his case by calling as witnesses the selectmen of the several towns who were charged by statute (G. L. c. 234, § 4) with the selection of prospective jurors; but counsel conceded that he had no basis for charging intentional discrimination on their part, and he offered not even a tendentious theory as to what he might prove through them. In the absence of even minimal substantiation (*Commonwealth* v. *Rodriquez,* 364 Mass. 87, 92 [1973]) of the charges the defendant made in his motion, the trial judge was justified in declining to grant the defendant a continuance. It should be noted that counsel had appeared for the defendant within a week after the indictments were found on March 20, 1975. He made a number of motions in May, but none dealing with jury selection. That motion finally was made on the day set for trial, with the venire ready and waiting. The venire list had been in his hands for only five days, but preparation of the constitutional claim did not have to await the delivery of the list. Thus the calling of selectmen, if considered significant,

---

[3] See *Castaneda* v. *Partida,* 430 U.S. 482, 499 (1977); *Akins* v. *Texas,* 325 U.S. 398, 403 (1945); *Carmical* v. *Craven,* 457 F.2d 582, 586-588 (9th Cir. 1971); *United States* v. *Butera,* 420 F.2d 564, 569 (1st Cir. 1970).

could surely have been arranged earlier or, in an extremity, for the day of trial. All this reinforces the evident conclusion that the discretion allowed in acting on an application for continuance (*Commonwealth* v. *Nunes*, 351 Mass. 401, 403-404 [1966]) was not abused. See *Commonwealth* v. *Underwood*, 3 Mass. App. Ct. 522, 537 n.15 (1975); *Windom* v. *United States*, 260 F.2d 384, 385 (10th Cir. 1958).

2. As noted, no objection was taken to the jury instruction now attacked, and we do not find reason to depart from the usual rule that a matter not excepted to affords no basis for appeal. See *Commonwealth* v. *Miskel*, 364 Mass. 783, 792-793 (1974). The attack, even if entertained under G. L. c. 278, § 33E, is anyway unavailing. The judge dealt with manslaughter at some length in his main charge, and there was and is no criticism of that instruction. The jury after some deliberation put a question: "Is a manslaughter charge valid if there is no provocation?" In reply, the judge defined manslaughter in the conventional way: "Voluntary manslaughter is a killing from a sudden transport of passion or heat of blood upon a reasonable provocation and without malice or upon sudden combat." *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931). In his ensuing remarks, the judge dwelt on "transport of passion," "reasonable provocation," and "without malice," but he did not dwell on "sudden combat," which has led counsel to argue that the instruction unfairly subordinated that point. But the law does not require repetition of the same thought at each turn. See *Commonwealth* v. *Redmond*, 357 Mass. 333, 342 (1970). Moreover, sudden combat is readily understood to be one of the events which may provoke the perturbation of mind that can end in a killing without malice. See Perkins, Criminal Law 57-59 (2d ed. 1969). Indeed the judge in his later instruction referred to the fist fight as possibly inducing a state of mind incompatible with malice.

There is further argument based on the judge's statement: "If you do not find in the evidence reasonable provocation on the part of the victim, as I defined it in my general instructions, the evidence is not sufficient for

you to find a verdict of manslaughter." Did this cast on the defendant the burden of proving provocation rather than leaving with the Commonwealth the burden of proving the contrary, as required by *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975)? See *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 687 n.4 (1976). There had been previous emphasis on the fundamental proposition that the Commonwealth must prove beyond a reasonable doubt every element of a crime charged, with three transcript pages of instructions on the element of malice in the crime of murder, and further instructions to the effect that malice and "transport of passion" were mutually exclusive. "Thus, the court made it clear to the jury that in order to find malice they had to find a state of mind free from passion generated by provocation." *Hallowell* v. *Keve*, 412 F. Supp. 681, 690 (D. Del. 1976). On the whole we think the charge would be understood as leaving the burden where it belonged.

After the *Mullaney* case it is well for judges to be particularly careful to charge with abundant clarity that the Commonwealth is bound to negate mitigating factors such as provocation.

3. On a study of the record we find no basis under G. L. c. 278, § 33E, for ordering a new trial or directing the entry of a verdict for a lesser degree of guilt.

*Judgments affirmed.*