COMMONWEALTH *vs.* MARK E. BASTARACHE.

Franklin.   May 20, 1980. — September 16, 1980.

Present: BROWN, PERRETTA, & DREBEN, JJ.

*Jury and Jurors. Constitutional Law,* Jury. *Evidence,* Photograph, Judicial discretion. *Homicide. Self-Defense. Proximate Cause. Practice, Criminal,* Instructions to jury.

At a criminal trial, evidence that, under the so called "key man" system, persons between the ages of eighteen and thirty-four were underrepresented in the jury pool by a 20% disparity constituted a prima facie showing that a sufficiently large and distinct group of people had been substantially underrepresented in the venire, and, in the absence of any explanation or justification by the Commonwealth for such under-representation, it was error to deny the defendant's motions to dismiss the venire and the indictment. [503-509]

At the trial of a defendant charged with manslaughter, the judge erred in admitting photographs of the victim's brain and cranial cavity depicting excessive blood due to hemorrhaging which resulted in the victim's death where the defendant conceded that hemorrhaging was the cause of death but asserted that such hemorrhaging was not the result of the defendant's blows but resulted from the effects of the victim's chronic alcoholism and where the photographs were highly inflammatory. [509-512]

At the trial of a defendant charged with manslaughter as a result of a fistfight between the victim and the defendant, the judge should have charged the jury, in his instruction on self-defense, that the defendant had the right to use appropriate and adequate means to protect himself when he reasonably believed his personal safety or life was in danger. [512]

At a manslaughter trial, the judge erred in instructing the jury that if they found beyond a reasonable doubt that the defendant failed to take reasonable and necessary steps to obtain medical assistance for the victim "then [they] would have to find beyond a reasonable doubt that of course the failure to do this was one of the causes of death." [512-513]

INDICTMENT found and returned in the Superior Court Department on September 13, 1978.

Pretrial motions were heard by *Cross, J.,* and the case was tried before him.

*Thomas Lesser (William C. Newman* with him) for the defendant.

*Stephen R. Kaplan,* Assistant District Attorney, for the Commonwealth.

BROWN, J. The defendant brings this appeal under G. L. c. 278, §§ 33A-33G, from his conviction by a jury in the Superior Court on an indictment charging manslaughter. He claims reversible error based (1) upon the trial judge's denial of his motion to dismiss the jury pool on the ground that there was systematic exclusion therefrom of persons under the age of thirty-five and (2) upon the judge's evidentiary rulings and instructions. We conclude that the conviction must be reversed. We set out the facts that are relevant to this appeal which might have been found by the jury.

The events giving rise to the defendant's conviction occurred on May 26, 1978, in and behind the V.F.W. club in Turners Falls. During the afternoon hours of May 26, 1978, the defendant, the decedent Pete Wilbur, and two young women, Jo Ann Stanwood and Rhonda Leahy, among others, were present at the V.F.W. club. The two young women accompanied one another. The defendant and Wilbur, although acquaintances, arrived at the club separately.

At some time before 3:00 in the afternoon, while the defendant and Wilbur were playing pool together, the defendant bought Stanwood and Leahy each a beer and conversed with them as they sat at a nearby table. Apparently the defendant's interest in Stanwood went unreciprocated, and in frustration he took her keys from the table in front of her and dropped them down her blouse. She became angry, and the two exchanged words. Wilbur interceded, suggesting that the defendant "clean up his act." One of the men suggested to the other that they go outside.[1] Wilbur, after a

---

[1] Stanwood testified that the defendant asked Wilbur if he wanted to go outside, and that Wilbur said, "I'll talk to you." According to Leahy, the

few minutes had passed, walked out the back door, and the defendant followed shortly thereafter. As the defendant exited, he removed a pair of sunglasses that he was wearing pushed up on top of his head and placed them on a table.

The defendant proceeded out the back door; Wilbur lunged at him, grabbing him by the hair. After shifting his weight, the defendant delivered three to five blows, within a second or two, to Wilbur's face and body, and Wilbur fell backward to the ground.[2]

A few moments or a very short time after the defendant had exited through the back door of the club he returned, again via the back door, and remarked to Stanwood that her friend was out back and that he, the defendant, was leaving. Several people in the club went to Wilbur's aid after Stanwood discovered him lying on his back bleeding through his mouth and nose moments after the defendant had exited through the front door of the club.

An ambulance was summoned which arrived at the V.F.W. club soon after the police. Wilbur was found lying motionless in Stanwood's lap. He was taken by stretcher to the ambulance, at which point it was noted that Wilbur's respirations dropped to four or five a minute, "about a

_____

defendant asked Wilbur if he wanted to go outside, and Wilbur said he did not. The defendant told Sergeant Couture of the Montague police that it was Wilbur who asked him if he wanted to go out back, and he testified at trial that Wilbur asked him if he wanted to go outside, to talk and not to fight, and that he said, "O.K."

[2] An eyewitness to the exchange, Brian Santos, testified that he was skate-boarding when he saw a "thin man" (the defendant), and a "fat man" (Wilbur), fighting in the manner described above. The defendant's statement to the police and his testimony at trial were similar, except that the defendant testified at trial that there was a brief interruption in his delivery of blows at Wilbur. He testified:

"Well, I walked out. I got hit in the face and I got my hair grabbed. It occurred either on the stairs or on the ground; I ain't too sure whereabouts it was. I didn't see anyone at the time when I got grabbed. I got hit here on the right side and got my hair grabbed. I punched a couple of times. I hit him, and he let go of my hair, and he came at me and I punched a couple more times, and he fell. And that's when I found out it was Pete."

quarter of the normal rate"; he showed no sign of a pulse. Throughout the four-minute ride to the Farren Memorial Hospital, a medical technician attempted cardio-pulmonary resuscitation on Wilbur without stimulating a heartbeat. A heartbeat was finally restored with the aid of electric defibrillation paddles. While he was at Farren Hospital, a test for Wilbur's blood alcohol content showed at a reading of .354, "slightly below that which is . . . capable of producing a fatality." He was transferred comatose to the Bay State Medical Center in Springfield, where he experienced seizures. He died without regaining consciousness four days later on May 30, and an autopsy was performed the following morning by a surgeon, Dr. William Mosig, and a pathologist, Dr. William Zussman.

The autopsy revealed that Wilbur had sustained a broken nose, two black eyes and a bruised lip, as well as a bruise on the back of the scalp.[3] Medical testimony and expert opinions based thereon offered on behalf of the Commonwealth and the defendant suggest that Wilbur died of blunt force injuries to the front and back of the head, or as a result of the combination of such injuries and the effects of alcoholism.[4]

After leaving the club, the defendant crossed the street and spoke with two friends regarding what had just occurred between himself and Wilbur behind the V.F.W. club. He appeared "very freaked out" by what had occurred. When he heard ambulance and police sirens, the defendant went to his brother's house one hundred yards from the V.F.W. club. After remaining there alone for an hour or two, the defendant went to his mother's house in Turners Falls. He told her he had been in a fight, went into

---

[3] Wilbur left a trail of blood on the ground between the point where his head was found lying and a flagstone, which was also covered with blood. It can be inferred from this, together with the bruise and cut on the back of Wilbur's head, that in falling backward Wilbur landed on the flagstone.

[4] The autopsy also revealed that Wilbur exhibited early stages of cirrhosis of the liver and chronic pancreatitis.

his room, and broke down crying.  He then called the police and went down to the station to give a statement, which squares with the episode as recounted above.  At trial, the defendant claimed that his actions were justified on the basis of self-defense.

Set out more fully, the defendant's principal arguments on appeal are these: (1) the judge erred in denying the defendant's motion to dismiss the pool from which the grand and petit juries were drawn because the process used to arrange such a jury pool systematically produced juries in which people between eighteen and thirty-four years of age were consistently underrepresented; (2) the judge erred in admitting color photographs of the decedent's brain and skull taken at the autopsy; (3) the judge's instruction on self-defense was defective; and (4) there was insufficient evidence to allow the jury to consider one of the Commonwealth's three theories of manslaughter, i.e., reckless conduct, resulting in violation of the defendant's due process rights.  For reasons that will appear below, we reverse the defendant's conviction and remand the case to the Superior Court, where the indictment against him must be dismissed.

1. *Jury Selection; Underrepresentation of Persons Between Eighteen and Thirty-four Years of Age.*

On September 13, 1978, a grand jury sitting in Franklin County returned the indictment against the defendant, precipitating the instant trial and appeal.  On October 10, 1978, defense counsel filed a motion to dismiss the indictment and dismiss the jury pool on the ground that a defendant was entitled to grand and traverse juries drawn from a jury pool representing a fair cross section of the community.[5] Persons under the age of thirty-five were not, according to the defendant's affidavit, reasonably represented in the jury pool from which the grand jury that returned the indictment and the traverse jury scheduled to hear the case were selected; this alleged underrepresentation had persisted in Franklin County since 1970.

---

[5] The defendant was nineteen years of age at the time of his trial.

A pretrial hearing was held on the defendant's motion to dismiss the indictment and the jury pool on portions of May 8, 9, 11, 16-18, and 21-22, 1979. The motion was denied on May 29, 1979, by the judge, who found that persons between eighteen and thirty-four had been reasonably represented in the jury pool; that persons between eighteen and thirty-four did not represent a cognizable class; and that, therefore, the defendant's constitutional arguments could not prevail.

Evidence adduced at the pretrial hearing indicated that prospective jurors in Franklin County are selected according to the so called "key man" system. Under that system, prospective jurors are selected by town selectmen, or by the secretary to the board of selectmen, in each of the twenty-six towns in Franklin County.[6] There is no uniform "system" among the twenty-six towns, however.

Each board of selectmen decides annually the number of prospective jurors to put in the pool from that town from which potential jurors will be selected for the county pool. Prior to each jury session of the Superior Court, the clerk of the court informs the various boards of selectmen, through a deputy sheriff, of the number of jurors required from each town for the particular session. The jurors for each session are selected at random from the pool selected by each town and the names are conveyed by the deputy sheriff to the clerk of the courts. There is no challenge to the manner by which the clerk places the names of prospective jurors on the jury pool list for a particular session. Rather, the dispute here focuses on the manner by which the selectmen choose names of potential jurors from their towns, and the result stemming therefrom, as this selection process forms the basis of the jury pool in Franklin County as finally constituted by the clerk of the court.

---

[6] Under G. L. c. 234, § 4, as amended through St. 1975, c. 713, selectmen are to choose jurors of "good moral character, of sound judgment and free from all legal exceptions."

In two towns in Franklin County, Whately and Shutes-
bury, the selectmen use street lists to choose prospective jur-
ors randomly, and then cause the persons selected to be sent
questionnaires. In the remaining towns, particularly in the
three largest towns which supply the majority of the pros-
pective jurors, the record demonstrates that selectmen per-
use the street list and choose people at their pleasure.[7] Al-
though the selection process was described somewhat differ-
ently by the selectmen from each town called as witnesses at
the pretrial hearing, by and large they selected people from
the street lists whom they knew.[8] In one case, a selectman
testified in substance that selecting prospective jurors "was
the most fun [he had had] since . . . elected. You set the
screws to people who never show up for any meetings and
don't do anything."[9] Others apprehended the process more
seriously, selecting people whom they knew and thought to
be "best" if they themselves were on trial. Whatever the
merits or faults of a system which arranges the jury pool on
the basis of town selectmen's personal acquaintances and
predispositions, the key man system has been accepted as
facially constitutional by the United States Supreme Court.
See *Carter* v. *Jury Commn.*, 396 U.S. 320 (1970); *Akins* v.
*Texas*, 325 U.S. 398 (1945); *Smith* v. *Texas*, 311 U.S. 128
(1940). At the same time, the Court has noted that this type
of system is "highly subjective"[10] and susceptible to abuse as
applied. *Castaneda* v. *Partida*, 430 U.S. 482, 497 (1977).
Our inquiry therefore turns to whether, as applied, the
process for selecting the jury pool in Franklin County consti-
tutes abuse of constitutional magnitude.

---

[7] By statute the street list in Massachusetts requires the age or date of
birth of the residents. G. L. c. 51, § 7.

[8] This appears to be not very different from the practice condemned in
*Smith* v. *Texas*, 311 U.S. 128, 131-132 (1940).

[9] This statement effectively turns on its head Mr. Justice Frankfurter's
notion that "sharing in the administration of justice is a phase of civic re-
sponsibility." *Thiel* v. *Southern Pac. Co.*, 328 U.S. 217, 227 (1946)
(Frankfurter, J., dissenting).

[10] At oral argument, counsel for the Commonwealth conceded that "my
brother has been pretty good in showing that this procedure is in the
nature of a non-system."

At the evidentiary hearing in the Superior Court, the defendant and the Commonwealth stipulated to the age of every person selected for jury duty between 1974 and 1979. Persons between eighteen and thirty-four represented at minimum 36.3% of the population in Franklin County eligible for jury duty from 1974 to 1979. Yet only 18.5% of the eligible jurors in the pool from which the jurors in this trial were drawn were between eighteen and thirty-four, a disparity of approximately 20%.[11]

The stipulated statistics further demonstrated that the lack of persons between eighteen and thirty-four chosen for jury duty from the 1978-1979 jury pool was not a one-year phenomenon. Persons between eighteen and thirty-four constituted only 16.7% of those chosen for jury duty in 1974-1975, 19% of those chosen in 1975-1976, 19.2% of those chosen in 1976-1977, and 22.4% of those chosen in 1977-1978.[12]

We cannot agree with the judge that as a matter of law a disparity of approximately 20%, give or take a few points in various years, in the percentage of those between eighteen and thirty-four years of age in the general population as compared to those selected to fill the eligible jury pool in Franklin County reflects a jury pool fairly representating a cross section of the community. See *Turner* v. *Fouche*, 396 U.S. 346 (1970) (disparity between 60% in general population and 37% in jury pool for a 23% disparity of the underrepresented class); *Whitus* v. *Georgia*, 385 U.S. 545 (1967) (disparity between 27.1% in the general population and 9.1% in the jury pool for an 18% disparity of the underrepresented class). See also *United States* v. *Butera*, 420 F.2d 564 (1st Cir. 1970) (disparity between 52% of the eligible

---

[11] It can also be persuasively argued that this is a fifty per cent deviation. See, e.g., Bell, Race, Racism and American Law 246 (2d ed. 1980).

[12] The statutory exemption from jury service for "persons under twenty-two years of age" was deleted from G. L. c. 234, § 1, by St. 1973, c. 925, § 76.

population and 36% of the jury pool for a disparity of 16%). Nor can we "allow the requirement of a 'distinct' group [or cognizable class] to be applied so stringently with regard to age grouping that possible discrimination against a large class of persons will be insulated from attack." *United States* v. *Butera*, 420 F.2d at 570.

It is of course now well settled that "juries must be drawn from a source fairly representative of the community." *Taylor* v. *Louisiana*, 419 U.S. 522, 538 (1975). *Duren* v. *Missouri*, 439 U.S. 357, 363 (1979). This "constitutional right"[13] (439 U.S. at 368) "is part of the established tradition in the use of juries as instruments of public justice." *Smith* v. *Texas*, 311 U.S. 128, 130 (1940).

To establish a prima facie violation of the fair cross-section requirement, the defendant must demonstrate that (1) the group alleged to be excluded is a "distinctive" group in the community, (2) the representation of this group in venires from which juries are drawn is not fair and reasonable in relation to the number of such persons in the community, and (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process.[14] *Duren* v. *Missouri*, 439 U.S. at 364.

---

[13] The Supreme Judicial Court has recently, in *Commonwealth* v. *Soares*, 377 Mass. 461, 478 (1979), expounded upon a defendant's right to a jury fairly drawn. In *Soares*, the court reviewed earlier cases that delineated the characteristics of the jury contemplated by art. 12 of the Declaration of Rights of the Massachusetts Constitution: *Commonwealth* v. *Ricard*, 355 Mass. 509, 512 (1969) ("[a] fair jury is one that represents a cross section of *community concepts* [emphasis supplied]"); *Commonwealth* v. *Martin*, 357 Mass. 190, 191 (1970), quoting from *Smith* v. *Texas, supra* ("It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body *truly representative* of the community [emphasis supplied]"); *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 92 (1973) ("A defendant is constitutionally entitled to a jury selection process free of discrimination against *his grouping* in the community [emphasis supplied]").

[14] Underrepresentation due to "systematic exclusion" in the selection process is demonstrated by a showing of consistent disproportion of the particular group over a period of time. *Duren* v. *Missouri, supra* at 366-367. The defendant must, therefore, demonstrate *under*representation rather than *un*representation, as the rather awkward phrase "systematic exclusion" might suggest.

Contrary to the judge's finding below that "young people" between the ages of eighteen and thirty-four do not form a cognizable class of individuals for purposes of selecting a jury, *United States* v. *Butera, supra*, counsels otherwise.[15] See generally Zeigler, Young Adults as a Cognizable Group in Jury Selection, 76 Mich. L. Rev. 1045 (1974). On the bases of *Butera* and the Supreme Judicial Court's recent expansion of a defendant's right to a jury fairly drawn in *Commonwealth* v. *Soares*, 377 Mass. 461, 478 (1979), as well as recent cases from the United States Supreme Court which have expanded a defendant's Fifth, and especially Sixth, Amendment rights under the United States Constitution to a jury selected from a source fairly representative of a cross section of the community, see *Taylor* v. *Louisiana*, 419 U.S. at 538; *Castaneda* v. *Partida*, 430 U.S. 482 (1977); *Duren* v. *Missouri*, 439 U.S. 357 (1979), we conclude that the defendant here has sustained his prima facie burden of showing that a sufficiently large and distinct group of people in Franklin County (eighteen-to-thirty-four year olds) has been substantially underrepresented in the venire from which both grand and petit jury pools are drawn, thereby shifting to the Commonwealth the burden of explaining such underrepresentation.

It is to be stressed, however, that once a defendant has made out his prima facie case, our inquiry does not end.

---

[15] Although this court did not reach a decision on this issue in *Commonwealth* v. *Scanlan*, 9 Mass. App. Ct. 173, 176 (1980), we referred there to the difference between cases where the defendant's argument that persons under twenty-five constituted a cognizable class failed (*Commonwealth* v. *Lussier*, 364 Mass. 414, 423-424 [1973]; *Commonwealth* v. *Peters*, 372 Mass. 319, 321-322 [1977]) and *Butera*, where the First Circuit Court of Appeals viewed a larger age classification (twenty-one — thirty-four) as one constituting "a cognizable — though admittedly ill defined — group for purposes of defendant's prima facie case." 420 F.2d at 570. Compare *Foster* v. *Sparks*, 506 F.2d 805, 813-817 (5th Cir. 1975). As *Duren* v. *Missouri, supra* at 368 n.26, makes plain, in the Sixth Amendment context, "systematic disproportion itself demonstrates an infringement" of the defendant's constitutional right to a jury drawn from a fair community cross section. Intent, design and purpose are irrelevant to a determination whether the defendant's right has been abridged.

"States remain free to prescribe relevant qualifications for their jurors . . . so long as it may be fairly said that the jury lists or panels are representative of the community." *Duren* v. *Missouri, supra* at 367, quoting from *Taylor* v. *Louisiana,* 419 U.S. at 538. The "right to a proper jury cannot be overcome on merely rational grounds," *Taylor,* 419 U.S. at 534, however. "Rather, it requires that a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." *Duren* v. *Missouri, supra,* 367-368. Consequently, "once the defendant has made a prima facie showing of an infringement of his constitutional right to a jury drawn from a fair cross section of the community, it is the State that bears the burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest. See *Taylor,* 419 U.S. at 533-535." *Id.* at 368. This the Commonwealth has not done here.

At the pretrial motion, in its brief and at oral argument, the Commonwealth contended that young people do not form a cognizable class for jury selection purposes (notwithstanding the ruling in *Butera*) and therefore "a lack of proportional representation [does not] of itself call for inquiry and explanation." As the Commonwealth failed to offer any explanation, rationale or evidence of any form that would rebut sufficiently the defendant's prima facie showing of constitutional abuse in the results over the past five years of the jury selection process in Franklin County at the venire selection stage, this issue requires that the judgment be reversed and the verdict against the defendant set aside.

2. We now mention those asignments of error that will likely arise at a possible retrial (after any reindictment) so as to insure that that trial is free of needless error which might unnecessarily precipitate further appellate review.

a. *Admission of autopsy photographs.*

At the very outset of its case, the Commonwealth introduced three eight and one-half by ten inch color photographs, only two of which are challenged here.

In his opening arguments, defense counsel suggested that, unbeknownst to the defendant, Wilbur was particularly susceptible to injury due to a high blood alcohol content and an enlarged brain, resulting from a cirrhotic liver and other effects of chronic alcoholism. The suggestion was that the defendant's blows may not have been the proximate cause of Wilbur's death. The Commonwealth, on the other hand, sought to demonstrate that Wilbur's death resulted from multiple blunt force injuries to his head occasioned by the defendant's punches, and Wilbur's fall resulting therefrom.

The Commonwealth sought to introduce two photographs that depicted the decedent's brain and cranial cavity as exposed during the autopsy. The Commonwealth argued that these photographs be admitted because they demonstrated the abnormal amount of blood covering the decedent's brain, which, according to the Commonwealth, was caused by tearing of particular blood vessels in the subarachnoid brain. It was suggested that Dr. Mosig would use these photographs to demonstrate that Wilbur died as a result of blunt force injuries to the head which produced the rupturing of these blood vessels.

Before the Commonwealth's opening statement, and again as the photographs were offered, defense counsel objected. Defense counsel conceded that hemorrhaging occurred, resulting in an abnormal amount of blood covering Wilbur's brain, which effectively caused his death. But defense counsel countered by pointing out that the overriding dispute concerned the agency which produced hemorrhaging in Wilbur's brain, not the hemorrhaging itself, and that photographs merely depicting excessive blood on Wilbur's exposed brain were therefore not only lacking in probative value but were highly and unduly inflammatory because of their graphic, indeed grisly, nature.

The admission of photographs of the victim is of course within the discretion of the trial judge. *Commonwealth* v. *Stewart,* 375 Mass. 380, 385 (1978). *Commonwealth* v. *Florentino,* 381 Mass. 193, 196 (1980). But where the "evidential value of the photographs which went to the jury

[is] overwhelmed by the prejudicial effect," *Common-wealth* v. *Richmond*, 371 Mass. 563, 565 (1976), we decline to yield to the judgment of the trial judge. As were the photographs in *Commonwealth* v. *Richmond*, *supra*, the autopsy photographs here of the decedent's exposed brain[16] were highly inflammatory due to their graphic depiction of an unsettling subject matter, and inaccurate if not misleading in characterizing the victim's face and head as rendered by the defendant's assault.

It should be stressed that the photographs of the decedent's brain and cranial cavity are entirely without relevance, as the defense did not contest the fact that Wilbur died as a result of massive hemorrhaging in the brain. Rather, the defendant disputed the cause of such hemorrhaging; a matter upon which the photographs shed no light. Having viewed these photographs, we do not doubt that the jurors' sympathies for the decedent were aroused in the extreme and that their objectivity may have been diminished considerably by their contemplation of these photographs. Even had the judge taken the cautionary measure of instructing the jury to view these exhibits only as they drew attention to a clinical, medical status, subdural and subarachnoid hemorrhaging, grave doubt remains that their admission could have been justified in these circumstances. Therefore following the principle of *Commonwealth* v. *Richmond*, *supra*, however narrowly there advanced, we conclude that it was error to admit the photographs because of the incalculable prejudice that they occasioned in the particular circumstances of this trial for manslaughter. Contrast *Commonwealth* v. *Lamoureux*, 348 Mass. 390, 392-393 (1965) (color photographs of a woman's body that accurately depicted wounds suffered in a beating

---

[16] It should be noted that in one of the photographs of Wilbur's exposed brain, the foreground and approximately three-fourths of the photo depicts the decedent's brain, while the background one-third of the photo depicts the remainder of the decedent's body lying out-stretched on the table, cut down the middle of the torso and pulled back, exposing the decedent's innards.

512        10 Mass. App. Ct. 499

Commonwealth *v.* Bastarache.

she received, taken while the victim lay in a hospital bed); *Commonwealth* v. *Cadwell,* 374 Mass. 308, 314-315 (1978) (undescribed photographs taken before and after autopsy which were relevant to the cause of death and the atrocity and cruelty which occasioned the victim's death).

b. *The judge's instruction on self-defense.*

The judge instructed the jury that the right of self-defense was available to the defendant only if there was evidence that he was threatened by an act "likely to produce *death or serious physical* harm to the defendant" (emphasis supplied). The defendant objected to this instruction both after the judge's initial instructions and again after the judge's supplemental instructions. The defendant argues that as this was not a situation where the defendant was protecting himself with a dangerous weapon likely to cause serious injury or death, but rather was protecting himself from the onslaught of the victim's punches with those of his own, contrast *Commonwealth* v. *Houston,* 332 Mass. 687, 690 (1955), the jury should have been instructed that the defendant had the right to use "appropriate and adequate means to protect . . . [himself]" when he "reasonably . . . [believed] that his *personal safety* or life . . . [was] in peril" (emphasis supplied). *Commonwealth* v. *DeCaro,* 359 Mass. 388, 389-390 (1971). We agree with the defendant that this would have been a fairer charge, especially as this was a close case where the jury had to assess finely the reasonableness of the defendant's response to the victim's aggression, and whether the defendant employed excessive force in defending himself in these circumstances. On any retrial, we suggest that the judge adopt this instruction to avoid unnecessary appellate review. See also Model Jury Instructions For Criminal Offenses Tried in the District Courts § 6.07, Self-Defense (1977).

c. *The Commonwealth's theory of wanton and reckless conduct.*

The defendant objected to any instruction being given on a reckless and wanton conduct theory of manslaughter before closing arguments and again at the side bar after the

trial judge had given his instructions, on the ground that there was insufficient evidence to submit the case to the jury on that theory. Defense counsel did not object to the Commonwealth's other two theories: (a) misdemeanor manslaughter — if in the course of an unlawful act, i.e., assault and battery, Wilbur died; or (b) sudden combat theory — if the defendant and Wilbur agreed to fight and during that fight Wilbur died.

The defendant's principal contention here is that the Commonwealth did not introduce evidence that his alleged wanton and reckless conduct *caused* Wilbur's death either (1) because the defendant had reason to believe that Wilbur was so drunk that he was susceptible to injury but struck him anyway (even if he acted in self-defense), or (2) that the defendant, not knowing Wilbur was drunk, reasonably defended himself, but then, after Wilbur fell down, obviously in danger of his life, walked back into the bar without making an effort to aid Wilbur. Without passing directly on what appears to be an argument of considerable merit, we would note that the judge erred in the instruction that he did give on causation, once he determined to submit this theory to the jury. The burden was on the Commonwealth to prove beyond a reasonable doubt that the defendant's "wanton and reckless acts" as herein described were the proximate cause of Wilbur's death. *Commonwealth* v. *Rhoades,* 379 Mass. 810, 823-825 (1980). See generally Nolan Criminal Law §§ 122-124 (1976). Instead, the judge instructed the jury, after a particular request on this issue by defense counsel for a correct instruction, that they could find that failure to take reasonable and necessary steps to obtain medical assistance "was *one of the causes* of death" (emphasis supplied).[17]

---

[17] The relevant portion of this instruction reads: "[I]f you find that without taking reasonable, necessary step [*sic*] to obtain medical assistance, if you find beyond a reasonable doubt that Bastarache left and you find also, beyond a reasonable doubt, then you would have to find beyond a reasonable doubt that of course the failure to do this was *one of the causes* of death" (emphasis supplied).

For the reasons set out above, the judgment is reversed, the verdict is set aside, and the case is remanded to the Superior Court for proceedings not inconsistent with this opinion.

*So ordered.*